1  Gregory C. Nuti (SB 151754)
   Kevin W. Coleman (SB 168538)
2  Christopher H. Hart (SB 184117)
   SCHNADER HARRISON SEGAL & LEWIS LLP
3  650 California Street, 19th Floor
   San Francisco, CA 94108-2736
4  Telephone: 415-364-6700
   Facsimile: 415-364-6785
5  Email: gnuti@schnader.com
           kcoleman@schnader.com
6          chart@schnader.com

7  Proposed Attorneys for Debtor,
   PEEK, AREN'T YOU CURIOUS, INC.

8

Schnader Harrison Segal & Lewis LLP
650 California Street, 19th Floor
San Francisco, CA 94108-2736
Telephone: 415-364-6700
Facsimile: 415-364-6785

9              **UNITED STATES BANKRUPTCY COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11               **SAN FRANCISCO DIVISION**

12 In re:                          Case No.: 16-30146 HLB_____

13 PEEK, AREN'T YOU CURIOUS, INC., Chapter 11

14              Debtor.

15                                 **DECLARATION OF MARIA C.
                                   CANALES IN SUPPORT OF PEEK,
16                                 AREN'T YOU CURIOUS, INC.'S FIRST
                                   DAY MOTIONS**

17                                 Date:      [tbd]
                                   Time:
18                                 Place:     U.S. Bankruptcy Court
                                              450 Golden Gate Avenue
19                                            Courtroom 19
                                              San Francisco, CA 94105
20                                 Judge:     Hon. Hannah L. Blumenstiel

21

22        I, Maria Cristina Canales, hereby declare and state as follows:

23        1.    I am a founder and Chief Executive Officer of Peek, Aren't You Curious, Inc., the

24 debtor and debtor-in-possession in the above-captioned case (the "Debtor" or "Peek"). Peek

25 designs, manufactures and sells, at both retail and wholesale, high quality children's clothing.

26 As a founder and Chief Executive Officer of Peek, and except as otherwise indicated herein, I

27 have personal knowledge of the facts set forth below, and if called as a witness I could and

28 would competently testify to the matters set forth in this declaration.

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

//

2.     I submit this declaration in support of the following motions filed herewith:

Motion to Approve Bidding and Sale Procedures and Setting Sale Hearing Date ("Sale Procedure Motion");

Motion to Approve Sale of Sale of Assets Free and Clear of Liens ("Sale Motion");

Motion to Assume and Assign Leases and Executory Contracts ("Motion to Assume");

Motion Authorizing Payment of Certain Employee Prepetition Wages and Honor Pre and Honor Employee Severance Agreements ("Wage Motion");

Motion to Authorizing Debtor to Maintain Prepetition Bank Accounts and Cash Management Systems ("Cash Management Motion");

Motion to Employ Gordon Brothers and Authorizing Liquidation of Certain Assets Remaining At Certain Retail Locations ("Motion to Employ Liquidators");

Motion to Employ DJM Realty Services, LLC as Real Estate Consultant ("Motion to Employ Real Estate Consultant");

Motion for Order (i) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service; (ii) Deeming Utilities Adequately Assured Of Payment; and (iii) Establishing Procedures For Determining Requests For Additional Adequate Assurance of Payment ("Utilities Motion"); and

Application for Order Pursuant to 28 U.S.C. §156(c) Authorizing Retention of Donlin Recano & Company, Inc. as Noticing and Claims Agent for Clerk Nunc Pro Tunc to the Petition Date ("Noticing Agent Motion").

3.     This declaration is also submitted to comply with section four of the Guidelines for Early Disposition of Assets in Chapter 11 Cases. The matters addressed in section four are set forth in the paragraphs noted below:

     a.     ***Alternatives to Sale***. A description of the efforts, if any, to pursue other alternatives such as financing, capital infusion, etc., including the period of time involved and the results achieved. *See* Paragraphs 26 to 29.

     b.     ***Marketing of Assets***. A description of the manner in which the assets were marketed for sale including the period of time involved and the results achieved. *See* Paragraphs 30 to 34.

     c.     ***Decision to Sell***. The date on which the debtor accepted the offer to purchase the assets. *See* Paragraphs 34 to 39.

PHDATA 5596551_1

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

d. ***Asset Valuation***. Disclosure of the debtor's prior valuations, within the last year, of the assets to be sold, if any. (i.e., book value, appraisals, financial statements, etc.) *See* Paragraph 42.

e. ***Relationship of Buyer***. A statement identifying the buyer and setting forth, to the best of declarant's knowledge, all of the buyer's (including its officers, directors and shareholders) connections with the debtor, creditors, any other party in interest, their respective attorneys, accountants, the United States Trustee or any person employed in the office of the United States Trustee. *See* Paragraph 40.

f. ***Post Sale Relationship with Debtor***. A statement setting forth, to the best of declarant's knowledge, any relationship or connection the debtor (including its officers, directors, shareholders, and employees) will have with the buyer after the consummation of the sale, assuming it is approved. *See* Paragraph 41.

g. ***Relationship with Secured Creditors***. If the sale involves the payment of all or a portion of secured debt(s), a statement of all connections between debtor's officers, directors, employees or other insiders and each secured creditor involved (for example, release of insider's guaranty). Not applicable.

h. ***Insider Compensation***. Disclosure of current compensation received by officers, directors, key employees or other insiders pending approval of the sale. *See* Paragraph 43.

**Summary**

4. As of its bankruptcy filing, Peek sold high-end children's clothing through twenty (21) retail stores in ten (10) states (one of which closed on January 23, 2016), a wholesale relationship with Nordstrom department stores, and an Ecommerce platform. Peek's gross revenues in the fiscal year 2014 were $26,899,638, and $28,842,234 in fiscal year 2015.

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

5.      Peek's primary assets consist of its inventory, trademarks and related intellectual property, fixtures located at its stores, office equipment, accounts receivable, and approximately $1,124,500 in cash. Peek owns no real property – all of its store locations, warehouse facilities, and headquarters space are leased. (The headquarters and warehouse facilities are month to month.)

6.      Peek has approximately 170 employees who are owed accrued wages totaling approximately $109,000.00 from February 1, 2016 through the filing date. In addition, Peek also has incurred approximately $121,500.00 in severance obligations to employees discussed in the Wage Motion. Peek has no secured debt or unsecured liabilities to any banks or other financial institutions, and it is also current on all of its state, federal and local tax liabilities. Its unsecured non-priority debts consist principally of anticipated lease rejection claims, and trade liabilities to its suppliers and service providers. Peek is current on rent for eight (8) stores it seeks to sell to a buyer (described in more detail below) but has not paid rent due February 1, 2016 for the thirteen (13) remaining locations that it expects to close.

7.      Peek has been experiencing operating losses of approximately $550,000 per month for some time. On February 4, 2016, Peek entered into an asset purchase agreement with Charlotte Russe, Inc. to sell its inventory, trademarks, store fixtures, Ecommerce platform, and leases for eight (8) of the retail stores. The primary financial goal of this case is to maximize returns to unsecured creditors by: (a) minimizing the accrual of post-bankruptcy rent and other administrative expenses, (b) reducing the pool of lease rejection claims through assignment of those leases, and (c) maximizing the recoveries from store inventory not sold to Charlotte Russe. Its post-bankruptcy operating budget and pro forma projection of unsecured creditor dividends if the proposed sale to Charlotte Russe is approved and the sale closes on or before March 15, 2016 is attached hereto as Exhibit B. At present, Peek projects having sufficient cash to pay approximately 50% to unsecured non-priority claim holders if the sale closes in early March, but less than 20% if the sale is not approved.

//

//

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

**Personal Experience and Company Overview**

8.     After working in retail sales since of the age of 16, I began my fashion career with The GAP. I began my 12 year tenure at the The Gap as assistant store manager and subsequently held several field positions including manager of its high-profile Melrose Avenue retail location. Thereafter, I was promoted to merchandising, holding a variety of posts throughout the brand's many divisions. As a senior merchant, I gained experience identifying trends and sourcing opportunities, in planning, production, design and delivery of product. Ultimately, I was promoted to Vice President of Women's merchandising, a $4 billion brand division, with both domestic and international responsibilities.

9.     After leaving The Gap in 2001, I, along with a partner, formed Peek in 2006 based on the concept to address a void that I believed existed in the children's clothing market. The product offering is a premium children's brand that offers high quality contemporary clothes that presented the same considerations that adults demand and expected in their wardrobe and that kids would love to wear: thoughtful detail, luxurious materials and interesting finishes that come together in durable, easy care styles that appeal to a child's sensibility and comfort while appealing to an adult's sense of style. Additionally, Peek retail locations also feature a curated collection of books, toys and accessories to compliment the clothing collection in a sophisticated and fun environment.

10.     The name "Peek… Aren't You Curious" stems from a concept related to this product offering and the intersection of an adult's nostalgic "peek" back into their own childhood while "peeking" forward into their child's future.

11.     The business plan was developed with three channels of distribution: company owned and operated stores, wholesale and online Ecommerce. Six distinct proprietary sub-branded product lines were created to allow style and personality separation which would also offer distinct wholesale opportunities. The sub brands were: Fleur des Champs, Williams and Sons, Sgt. Fletcher, Surf Royalty, Craft Dungarees and Little Peanut.

12.     Peek owns and operates twenty (20) retail locations in ten (10) states, as well as selling product through its Ecommerce web site. (Peek recently closed its location at the

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

Aventura Mall in Aventura, Florida.)  Peek also sells its branded product at wholesale to Nordstroms Inc. Peek generates roughly 60% of its revenue from its retail locations, 8% from through Ecommerce, and 32% through wholesale distributions.  As noted, gross revenue in fiscal year 2014 and 2015 were $26,899,638 and $28,842,234, respectively.  From this revenue, Peek incurred losses in 2014 and 2015 of $(5,033,743) and $(6,670,211), respectively – an average of approximately $550,000 per month.

13.     In addition to its retail locations, Peek maintains corporate offices at 425 Second Street, San Francisco, California and a distribution center located at 2256 MacArthur Blvd., Tracy, CA 95376.

14.     Peek intends to use these Chapter 11 proceedings to consummate a sale of approximately eight (8) retail locations and related design and production assets to Charlotte Russe, Inc., or another entity that may submit a higher and better offer for the Peek assets.  The terms of this proposed transaction are contained in the Asset Purchase Agreement attached hereto as Exhibit A and discussed in more detail below.  Peek intends to liquidate the inventory at its remaining twelve (12) retail locations, close them, and cease operations.  Peek also intends to explore whether value can be recovered from the leaseholds for the 13 retail locations that are not anticipated to be assigned to the proposed buyer.

**Company History**

15.     In 2006, my partner and I formed Peek initially as a limited liability company with $1.5 million in capital which we each personally contributed.

16.     With the initial capital, Peek opened its first three physical stores, the first of which was opened in February of 2007 and located in Santa Monica, CA.  In October 2007, Peek opened it second store in Corte Madera CA followed by a third store in Scottsdale, AZ in November of the same year. Additionally, Peek launched its Ecommerce site.

17.     After this initial launch, Peek sought outside investor capital and closed a $5.15 million first round of funding in September 2007. As a result of this financing, Peek converted to a C Corp.

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

18.     In 2008, Peek opened four additional stores; Fashion Island in Newport Beach CA (April), Americana at Grand in Glendale CA (May), Fashion Valley in San Diego CA (August) and Northpark in Dallas TX (October).  Peek continued to develop Ecommerce and launched its wholesale channel, supplying several specialty boutiques and Barney's New York.

19.     In the fall of 2008, Peek closed a second financing for $10 million from Mousseluxe SARL.

20.     In late 2008, however, Peek began to suffer a series of setbacks related to the economic downturn caused by the Great Financial Crisis.  This change in the economic environment resulted in Peek receiving an inordinate number of wholesale order cancellations against product for which Peek was already obligated and several unpaid wholesale invoices.

21.     In response to the deteriorating overall economic situation in 2008 and 2009, Peek began to renegotiate the existing rent structures, evaluate store locations, focus on building in store staff and close down the then un-profitable wholesale channel.  Ultimately Peek shuttered the American at Brand (November 2009), a location in Roseville (July 2010) and Fashion Valley (May 2011) locations, while it negotiated rent relief on the remaining stores.

22.     Peek soon recognized that as a small vertical retailer it lacked economies of scale to achieve target margin efficiency or to internally support the needed infrastructure in areas of Ecommerce, Real Estate, IT, Logistics and Marketing.  Peek determined that the best course was to identify strategic partners.  In August of 2010, Peek partnered with Nordstrom Inc., with Peek providing Nordstrom with Peek designed product through its wholesale channels, thus contributing to Peek's economy of scale and increasing margin efficiency.  Nordstrom also agreed to assist in Marketing, IT, Ecommerce and Real Estate.  Equally as important, Nordstrom made an equity investment in the company to finance its inventory purchases and assure that Peek was financially viable.  Mousseluxe also agreed to participate in this financing.  The financing was structured as a common stock investment.

23.     Peek's wholesale relationship with Nordstrom quickly grew from an initial product offering in 20 Nordstrom stores in March of 2011, to 50 in May 2011 and to all 115 full

line Nordstrom stores by July 2011.  In 2011, Peek generated $1.7 million in revenue from this relationship.

24.     In 2012, Peek continued to grow, opening four stores: University Village, Seattle WA (May 2012), Fashion Place, Murray UT (August 2012), Fashion Square, Scottsdale AZ (August 2012) and Bellevue Square, Seattle WA (October 2012).

25.     In 2013, Mousseluxe and Nordstrom committed to invest $6.4 million each in additional common equity to fund store growth.  Peek opened 7 new stores in 2013: University Town Center in La Jolla CA (April 2012), Chestnut Street in San Francisco CA (August 2013), Houston Galleria in Houston TX (September 2013), Park Meadows in Denver CO (September 2013), Northbrook Court in Northbrook IL (October 2013), Oakbrook in Oakbrook, IL (November 2013), and Merrick Park in Coral Gables FL (December 2013).

***Efforts to Explore Alternatives to Sale***

26.     In 2014, Peek engaged the investment bank of William Blair & Company to advise and assist in seeking growth equity capital to continue its store build out, make a significant Ecommerce investment and execute on much needed marketing initiatives in order to become a fully realized Omni-channel retailer.  William Blair expressed high confidence that the thorough growth plan would yield several prospective, competitive investor partners.  However, after more than eight months of management focus on due diligence, investor information and meetings, no viable investor emerged.

27.     During this period, Mousseluxe and Nordstrom each committed up to $6 million in convertible bridge notes to provide working capital until a strategic partner was identified. Peek opened five new locations in anticipation of obtaining additional growth capital: Phipps Plaza in Atlanta GA (April 2014), Damen Avenue in Chicago IL (May 2014), The Woodlands in Houston TX (September 2014), Mall of America in Minneapolis MN (October 2014) and Aventura in Miami FLA (November 2014) and continued to invest in infrastructure and headcount.  Peek's operating loss, however widened to $5 million, driven largely by new store operating costs, key talent upgrades to set the foundation for growth, along with consulting and other onetime investments.

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

28.     When William Blair failed to source any viable investors, Peek targeted operational initiatives to develop a five year plan to profitability by early 2018. Based on this plan, Mousseluxe and Nordstrom funded an additional $4.6 million, converted to equity existing bridge notes of $10.7 million and structured another equity round of funding. The early 2015 plan proved to be overly optimistic as Peek faced a retail environment in which competitors aggressively competed on price forcing Peek to mark down its prices more aggressively in order to monetize product inventory which in turn caused a sizeable impact to sales, margin, profitability and cash reserves.

29.     By late July 2015, Peek identified a need to close several stores and reduce headcount. But even with these reductions, the company would be cash challenged by late 2015/early 2016. At this point, Mousseluxe and Nordstrom, Peek's two majority shareholders, indicated that they were not interested in making further investments in Peek, but Nordstrom was open to any solution that preserved the wholesale relationship.

*Marketing of Assets*

30.     In mid-August, Peek and Nordstrom investigated an acquisition of Peek by Nordstrom. A proposal was developed that would close 10 unprofitable retail locations, leverage Nordstrom's scale, operational and functional expertise and reduce Peek's HQ. The savings generated were expected to yield positive EBITDA in 2016. On September 28, 2015, Nordstrom, after serious internal consideration, declined to pursue the opportunity. It should be noted again that Nordstrom had made a substantial investment in Peek, served on Peek's board, was interested in continuing the Peek wholesale business. It therefore seemed to be best positioned to understand the value proposition in acquiring a scaled back version of Peek, and so its decision not to proceed raised questions about Peek's overall value.

31.     On September 30, 2015, Peek's board convened to discuss options, including ceasing operations and filing Chapter 7 bankruptcy by the end of fiscal year 2015, while continuing to pursue any "last ditch" investors or acquirers. Peek Board Chair, CEO and CFO had a series of meetings with William Blair to identify potential investor/acquirers and define a timeline. It was quickly apparent that the process to identify, engage and complete a transaction

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   would be too lengthy, too costly and held little to no probability of success.  As a result, Peek

2   terminated its relationship with William Blair but continued to independently seek an

3   investor/acquirer.

4          32.    In mid-October, Peek needed to decide whether to order Spring inventory for both

5   its retail locations and Nordstrom's wholesale purchase to be delivered beginning in January

6   2016, a financial commitment of several million dollars.  In the normal course, Peek places its

7   orders for product with its overseas manufacturers several months in advance of when the

8   product is needed in the stores for the next season.  Thus, Spring inventory is ordered in mid-

9   October, with deliveries starting the following January and continuing through February.  In

10  general, Peek becomes financially obligated for inventory from the manufacturer upon each

11  shipment being invoiced and placed in transit to Peek's distribution center.  For inventory sold at

12  wholesale, e.g. to Nordstrom, Nordstrom becomes obligated to Peek upon the shipment from

13  Peek to Nordstrom.  Peek struggled whether to place its Spring inventory orders given the

14  uncertainty of whether it would still be operating by the time the shipments were ready.  While

15  Peek was not legally obligated for the product until shipped, it did not want its manufacturers to

16  incur production costs if Peek would be ceasing operations prior to the Spring season.

17         33.    With the Spring 2016 inventory commitments looming, Nordstrom verbally

18  agreed, in essence, to guarantee acceptance of 100% of Peek's Spring 2016 inventory

19  production.  In addition to purchasing inventory through the wholesale relationship, Nordstrom

20  indicated its willingness to pay for inventory originally intended for Peek's own retail locations

21  in the event Peek shut down at year end.  This gave Peek some comfort in ordering Spring

22  inventory for its retail locations and extended the time Peek had to seek another

23  investment/acquisition solution.

24         34.    In late October, early November, I met with the CEO of Gap Inc. to gauge any

25  potential interest the Gap may have had in either investing or acquiring Peek.  After

26  consideration, Gap Inc. also passed on the opportunity.

27  //

28  //

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

*Purchase Offer from Charlotte Russe, Inc.*

35.     In mid-November, I was approached by Jenny Ming, CEO of Charlotte Russe, to discuss Charlotte Russe's potential interest in investing in or acquiring Peek. My understanding based upon my discussions with Ms. Ming is that she heard about Peek's situation from a mutual friend. After a series of meetings and expedited due diligence, Charlotte Russe offered to purchase some of Peek's assets pursuant to an Agreement for Purchase And Sale of Assets ("APA") dated February 4, 2016. A true and correct copy of the Charlotte Russe APA is attached hereto as **Exhibit A**.

36.     Under the terms of the APA, Charlotte Russe has agreed to acquire the following assets:

- 8 of Peek's 21 retail stores and 1 storage location as set forth on Schedule 2.1.3 of the APA, including inventory, trade fixture and other operating assets;

- Inventory at Peek's distribution centers and in transit;

- Ecommerce assets and associated contracts;

- Assumption of contracts for inventory ordered but not yet delivered;

- An $597,654 account receivable owed by Nordstrom for inventory sales (but it should be noted that Charlotte Russe is assuming an $850,438 corresponding liability which represents Peek's inventory purchase obligation to the vendors); and

- Intellectual property associated with the design and manufacturing of Peek's brand and product lines.

37.     The consideration provided by Charlotte Russe is an assumption of Peek's obligations under the leases for the 8 retail locations and the various other executory contracts, and its liability for so-called Spring 2 inventory purchases that as noted approximate $850,000. Charlotte Russe is further agreeing to pay Peek the amount of all security deposits held by landlords at the eight retail locations it will acquire that in the aggregate total approximately $48,000.00 (which would be unavailable to creditors if the leases were rejected), to pay an additional $10,000 for fixtures located at the 13 closed stores, and reimburse Peek for certain pre-paid expenses. Although the transaction will not generate substantial cash, it does reimburse

Peek for the potential administrative cost of the post-petition Spring inventory deliveries, and relieve Peek from substantial lease and contract rejection damage claims. Most importantly, approval of the sale will allow Peek to distribute more cash to a smaller pool of unsecured creditors than if all 20 remaining stores were closed. Attached hereto as **Exhibit B** is a pro forma distribution analysis comparing recoveries under the proposed sale to what would be expected if the sale was not approved.

38. Charlotte Russe will also be hiring twelve (12) headquarters staff (including as discussed below myself ), and approximately fifty-six (56) store employees.

39. While I believe that the offer received from Charlotte Russe is the highest and best offer currently available, Peek will contact all of the entities that expressed interest in Peek's assets though the process undertaken with the assistance of William Blair & Co. and consider any proposals that may be forthcoming.

### *Charlotte Russe's Relationships to Peek*

40. To the best of my knowledge, neither Charlotte Russe, nor any of its officers, directors, or material equity holders is an investor, creditor, or affiliate of Peek. I have, however, had a past professional relationship with Jenny Ming, who as noted above is Charlotte Russe's CEO. I worked under, but not directly for, Ms. Ming, while I was employed by Old Navy from 1995 to 1998.

### *Peek's Post-Sale Relationship to Charlotte Russe*

41. Assuming the proposed sale is approved, there will be no ongoing relationship between Peek and Charlotte Russe, and neither entity will be an investor in or creditor of the other. To the best of my knowledge, no Peek shareholder, officer, or director is currently an investor in or creditor of Charlotte Russe, nor will any such person become a creditor or interest holder in Charlotte Russe as a result of the proposed sale. I will be the only person in Peek's senior management that is expected to be retained by Charlotte Russe post-closing.

### *Valuations of Assets to be Sold*

42. Within one year prior to the bankruptcy filing, Peek valued its assets for purposes of preparing its financial statements. Peek, however, did not prepare, commission or receive any

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

appraisals or valuation opinions of the fair market value of its assets during that time frame.  The

book value of its assets as of the end of its fiscal year 2015 (ending January 30, 2016) was:

| | |
|---|---|
| Cash | 1,692,000.00 |
| Accounts Receivable | 928,000.00 |
| Inventory, Net | 5,277,000.00 |
| Pre-Paids and Other Current | 305,000.00 |
| Fixed Assets, Net | 5,280,000.00 |
| Other Long Term Assets | 298,000.00 |

***Insider Compensation***

43.    Current compensation received by officers, directors, key employees, or other

potential insiders pending approval of the sale is as set forth on attached **Exhibit C**.

**Timing of the Proposed Sale**

44.    Peek requests that the Court set hearings on the First Day Motions on or before

February 12, 2016.  It is hoped that the sale to Charlotte Russe or other overbidder can close

early in March in order to minimize administrative expenses associated with post-bankruptcy

rent and employee costs (among other things).  As set forth on Exhibit B, assuming recoveries

from sale of inventory at the stores to be closed meet our estimates (that were based upon advice

received from Gordon Brothers, the proposed liquidators), Peek expects to be able to operate on

a cash flow positive basis through March 15, 2016.  But if the sale is delayed past March 15,

Peek will begin to incur substantial operating losses owing largely to the accrual of additional

rent and employee costs.  Of course, if the closing occurs closer to March 1, those rent and labor

costs will be reduced.  Thus, it is in the best interest of creditors and will maximize the value of

the estate to consummate the sale to Charlotte Russe and cease operations as soon as possible.

45.    In the meantime, however, Peek is required to continue to operate in order to

maintain the value of the assets.  Each of the First Day Motions addresses operational issues that

will allow Peek to continue its business post-petition with minimal interruption and seeks

procedural mechanisms and orders designed to minimize operational losses by shortening the

time for a hearing on the proposed sale.

46.     Specifically, as for the Wage Motion, a condition of Peek's agreements with both the Liquidators and Charlotte Russe require Peek to maintain its work force through the transition. This is a requirement for the obvious reason Peek needs employees to assist in liquidating the inventory at the stores to be closed and to continue to operate the stores being acquired. Any disruption in the work force would have a negative effect on expected recoveries for these assets. Therefore, Peek believes it in the best interest of the estate to ensure to avoid any disruption in payroll and to provide some incentive for certain employees for staying on through what is hoped to be a short transition.

47.     Peek also will need to maintain its utility services and banking relationships described more fully in the Utility Motion and Cash Management Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 5th day of February, 2016 at San Francisco, California.


                                   /s/ Maria C. Canales
                                   Maria C. Canales

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 5596551_1

1                               **Exhibit A**

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

# AGREEMENT FOR PURCHASE AND SALE OF ASSETS

This Agreement for Purchase and Sale of Assets ("Agreement"), is made and entered into this 4th day of February, 2016, by and between Peek, Aren't You Curious, Inc., a California corporation ("Seller"), and Charlotte Russe, Inc., a California corporation, or its assignee ("Buyer").

## RECITALS

A.      Seller is in the business of developing, marketing and distributing premium branded children's apparel (the "Business").

B.      On or before February 5, 2016, Seller shall file a petition seeking protections as a debtor and debtor in possession (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court");

C.      Seller desires to sell and Buyer desires to purchase the Assets (as defined below) pursuant to the terms and conditions set forth herein.

D.      In connection with the Chapter 11 Case and subject to the terms and conditions contained herein and following the entry of the Sale Approval Order finding Buyer as the winning bidder and subject to the terms and conditions thereof, Seller shall sell, transfer and assign to Buyer, and Buyer shall purchase and acquire from Seller, pursuant to Sections 363, 365 and 105 of the Bankruptcy Code, the Assets, as more specifically provided herein and in the Sale Order.

E.      The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court of, and will be consummated only pursuant to, this Agreement and a Sale Approval Order to be entered in the Chapter 11 Case.

NOW THEREFORE, in consideration of the mutual representations, covenants and promises set forth herein, the parties hereby agree as follows:

## ARTICLE I—DEFINITIONS AND INTERPRETATIONS

1.      Defined Terms.  For purposes of this Agreement,

"Balance Sheet" shall mean the unaudited balance sheet of Seller as of January 2, 2016 included in the Financial Statements.

"Books and Records" shall mean all books, records and recorded information, including customer and supplier lists, of Seller primarily related to the Business as of the Closing Date.

"Business Day" shall mean a day other than Saturday, Sunday or any other day on which banking institutions in New York, New York or San Francisco, California are required or authorized to close by law or executive order.

"Copyrights" shall mean the registered copyrights and applications held in Seller's name set forth on Schedule 1.1(a), and any other copyrights or works of authorship owned by Seller which are used or held for use primarily in the conduct or operation of the Business.

"Cure Costs" shall mean all costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Leases and Assumed Contracts.

"Domain Names" shall mean the web addresses and domain names held in Seller's name set forth in Schedule 1.1(b), and the applications and registrations therefor.

"Financial Statements" shall mean the unaudited balance sheets of Seller as of January 3, 2015 and January 2, 2016 and the related unaudited statements of operations, stockholders' equity (deficit), and cash flows for each of the two years in the period ended January 3, 2016 and the unaudited balance sheet of Seller as of January 2, 2016 and the related consolidated statements of operations and cash flows for the eleven (11) months then ended.

"Governmental Entity" shall mean any court of competent jurisdiction, legislature, governmental agency, administrative agency or commission or other governmental authority or other instrumentality of the United States or any other country, or any state, county, city or other political subdivision thereof.

"Intellectual Property" shall mean, collectively, know how, trade secrets, the Trademarks, the Copyrights, the Trade Dress, the Domain Names, software and patents.

"Inventory" shall mean the units of finished product as of the Closing Date.

"Knowledge" or "Known" shall mean with respect to Seller, the actual knowledge of each of the individuals set forth on Schedule 1.1(c).

"Liability" shall mean any liability, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"Lien" shall mean any lien (statutory or otherwise), claim, charge, option, security interest, pledge, mortgage, restriction, financing statement or similar encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and any assignment or deposit arrangement in the nature of a security device).

"Material Adverse Effect" shall mean any fact, condition, change or event that could reasonably be expected to materially and adversely affect the Assets or the operations, financial condition or prospects of the Business; provided, however, that any determination of whether there has been a Material Adverse Effect shall not include any fact, condition, change or event: (i) that generally affects the industry in which Seller operates so long as Business is not disproportionately affected thereby relative to other participants in such industry, (ii) that results from general economic conditions in the United States so long as the Business is not disproportionately affected relative to other companies in the United States or (iii) that results

- 2 -

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 17 of 72

from the taking of any action specifically required to be taken by this Agreement. For the sake of clarity, the parties agree that a fact, condition, change or event having an adverse impact on the Assets or creating incremental Liabilities for Buyer (under a theory of successor liability or otherwise) following the Closing of One Million Dollars U.S. ($1,000,000) or more shall be deemed to be "material."

"Permits" shall mean all transferable licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like relating exclusively to the conduct of the Business for which consent is obtained.

"Person" shall mean any individual, group, corporation, partnership or other organization or entity, including any Governmental Entity.

"Spring 2 Inventory" means the merchandise covered by the supply purchase orders/commitments for Spring 2 inventory listed on Exhibit A to Schedule 2.1.4.

"Registered Intellectual Property" shall mean any Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with or recorded by any Governmental Entity, other public legal authority or internet domain registrars or registries.

"Taxes" or "Tax" in the singular form, shall mean any and all taxes, levies or other like assessments, including income, transfer, gains, gross receipts, excise, inventory, property (real, personal or intangible), custom duty, sales, use, license, withholding, payroll, employment, capital stock and franchise taxes, imposed by any Governmental Entity.

"Trade Dress" shall mean the trade dress and packaging held and used by Seller or held for use by Seller in the conduct or operation of the Business as of the Closing Date.

"Trademarks" shall mean all trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor held in Seller's name which are used or held for use in the Business as set forth on Schedule 1.1(d), together with the goodwill associated therewith.

## ARTICLE II – PURCHASE AND SALE

2.     Purchase and Sale of Assets.

2.1     Assets.  Subject to the terms and conditions of this Agreement and in consideration of the Buyer's assumption of the Assumed Liabilities, on the Closing (as defined herein), Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in the following assets (collectively, the "Assets"):

2.1.1   Equipment, trade fixtures, furniture, warehouse racks and related equipment, office supplies, shopping bags, receipt paper, price tags, tagging equipment, computers and related equipment, telephones and related equipment, tools, parts, Inventory, product samples, and other tangible personal property, located at the Retail Stores (as defined

- 3 -

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 18 of 72

below), Seller's headquarters office and at Seller's warehouse facility located in Tracy, California; provided that Buyer shall have the right, by notice to Seller prior to the Closing Date, to decline items of equipment and furniture held at the headquarters office;

     2.1.2   Inventory and supplies held by Seller's third-party expeditor, Expeditors Imports, or in transit on the Closing Date;

     2.1.3   The leases listed on <u>Schedule 2.1.3</u> (the "<u>Assumed Leases</u>") relating to the retail store locations described therein (the "<u>Retail Stores</u>") and any security deposits provided to the lessors thereof;

     2.1.4   The contracts listed on <u>Schedule 2.1.4</u> (the "<u>Assumed Contracts</u>");

     2.1.5   The sign holders, containers, shoe risers and fixtures listed on <u>Schedule 2.1.5</u> (the "<u>Additional Fixtures</u>");

     2.1.6   Intellectual Property, archives, records and embodiments, including all product specifications, physical samples and screens (*i.e.*, graphic designs);

     2.1.7   Purchase orders placed by Seller with vendors, purchase orders received by Seller from customers, work/orders in progress, instruments, arrangements and commitments of any kind which are transferable and which relate to merchandise which would have constituted Inventory comprising part of the Assets under <u>Section 2.1.1</u> or <u>2.1.2</u> if such merchandise had been received by Seller prior to the Closing Date;

     2.1.8   The name "Peek, Aren't You Curious" and logos and other names, marks, logos used by Seller now or in the past;

     2.1.9   To the extent permitted by applicable state and federal privacy laws and Seller's privacy policies, customer and vendor lists, and all files and documents and information, including customer account information, domain name, user names, passwords, real names, postal and email addresses, telephone and facsimile numbers relating to such customers and vendors, whether maintained electronically or in hard copy to serve Seller's customers;

     2.1.10  Advertising, sales and customer materials, forms, labels, promotional materials, manuals and supplies;

     2.1.11  Books and Records; provided however, that following the Closing Buyer shall permit Seller to have reasonable access to such records existing at the time of the Closing as may be necessary to perform its obligations and/or otherwise administer the Chapter 11 Case;

     2.1.12  Cash on hand at the Retail Stores at the time of the Closing; and

     2.1.13  All accounts receivable constituting the right to receive payments from Nordstrom, Inc. (or one or more of its affiliates) in respect of its purchases of Spring 2 Inventory (the "<u>Nordstrom Receivables</u>").

- 4 -

Case: 16-30146   Doc# 15   Filed: 02/05/16   Entered: 02/05/16 22:27:39   Page 19 of 72

2.2    Excluded Assets.  Pursuant to this Agreement, Seller is not transferring to Buyer any of the following assets (the "Excluded Assets"):

2.2.1    Cash or cash equivalents other than cash on hand at the Retail Stores at the time of the Closing;

2.2.2    All accounts receivable constituting the right to receive payments in respect of goods or services to the extent such goods or services were delivered or provided on or prior to the Closing Date other than the Nordstrom Receivables; and

2.2.3    Equipment, trade fixtures, furniture, warehouse racks and related equipment, office supplies, shopping bags, receipt paper, price tags, tagging equipment, computers and related equipment, telephones and related equipment, tools, parts, inventory, product samples, and other tangible personal property, located at Seller's other retail stores that are not subject to this transactions; provided that Buyer reserves the right to purchase any such assets at fair market value by separate agreement; and

2.2.4    Claims or causes of action of Seller against any third party, whether contingent, unliquidated or otherwise, arising under Sections 506, 544, 545, 546, 547, 548, 549, 550, 551, 552 and 553 of title 11 of the Bankruptcy Code.

2.3    Free and Clear.  The sale of the Assets by Seller, and the acquisition of the Assets by Buyer shall be free and clear of Liens.  Except for the Assumed Liabilities (as defined below), Buyer will assume none of Seller's liabilities whatsoever, whether relating to the Assets or otherwise.

2.4    Contracts.

2.4.1    Buyer shall not assume any obligations, duties or liabilities, of any nature whatsoever, under any of Seller's contracts, except with respect to any agreements set forth in Section 2.4.2 below.

2.4.2    On the terms and subject to the conditions set forth in this Agreement, on the Closing, Seller shall assume the Assumed Leases and Assumed Contracts and assign them to Buyer for Buyer to perform (and indemnify and hold Seller harmless against all liabilities and obligations arising thereunder after the Closing, including, but not limited to all rent, utilities, Taxes, excluding income Tax, and all other post-closing expense items) the contractual obligations of Seller thereunder arising from and after the Closing (but not including any Cure Costs) (the "Assumed Liabilities").  The Cure Costs associated with the Assumed Leases and Assumed Contracts, if any, have been determined in good faith by Seller based on Seller's Books and Records and are as set forth as of the date hereof on Schedule 2.4.2. Seller shall be responsible for providing notice to the non-debtor parties to all Assumed Leases and Assumed Contracts and shall make any filings and appearances with the Bankruptcy Court as required by the Bankruptcy Code or this Agreement.  The Cure Costs shall be paid by Seller, except for any Cure Costs under the purchase orders for Spring 2 Inventory purchases identified on Exhibit A to Schedule 2.1.4.

- 5 -

2.5 <u>Excluded Liabilities.</u> Except as specifically set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and shall have no responsibility or obligation whatsoever for, any liabilities of, or claims against, Seller or any of the Assets (collectively, the "<u>Excluded Liabilities</u>"), which shall include without limitation the following:

2.5.1 any successor or transferee liability of any kind or nature whether or not relating to any defective products;

2.5.2 any and all contracts or other agreements with any labor union, including any collective bargaining agreement, and any obligation relating to any employment contract or union contract;

2.5.3 wages, salary and vacation, holiday and personal time off accrued prior to, or in connection with, the Closing;

2.5.4 any obligations with respect to the employment of any of Seller's former or present employees, including, without limitation, unemployment compensation, severance pay and any Liability under the WARN Act or similar laws;

2.5.5 any obligation to hire or otherwise employ any former or present employee of Seller, whether under any union agreements or otherwise;

2.5.6 any obligations under any employee benefit plan maintained by the Seller, or under which the Seller is obligated or bound, including, without limitation, those plans based on length of service with Seller, or any other obligation owed to the former or present employees of Seller;

2.5.7 any liabilities based upon, or arising out of, in whole or in part, any facts, circumstances or events existing or occurring at any time prior to the Closing, including any accounts payable or trade account payable;

2.5.8 any liabilities of any kind or nature related to executory contracts or unexpired leases;

2.5.9 any Liability of Seller for any Tax; and

2.5.10 any Liability accrued prior to the Closing.

2.6 <u>Purchase Price and Payment.</u>

2.6.1 <u>Purchase Price.</u> The purchase price (the "<u>Purchase Price</u>") for the Assets shall consist of the following:

2.6.1.1 <u>Assumed Liabilities.</u> At the Closing, Buyer shall assume the Assumed Liabilities in accordance with <u>Section 2.4.2</u>.

2.6.1.2 <u>Security Deposits.</u> At the Closing, Buyer shall pay to Seller an amount equal to the security deposits for the Retail Stores.

- 6 -

2.6.1.3    Pro Rated Items.  If any (a) Taxes (including, but not limited to, real estate Taxes, personal property Tax, ad valorem Tax and similar non-income Taxes), other assessments or utility charges relating to, or arising out of the ownership, use or transfer of, the Assets (including, but not limited to any water, sewer and other municipal charges owed to any governmental authority and utility charges), imposed on a periodic basis beginning before and ending after the Closing Date, (b) payments under the Assumed Leases or Assumed Contracts, or (c) payments of health insurance costs for employees who will be hired by Buyer but not added to Buyer's health plan until forty-five (45) days after closing (the items in clauses (a), (b) and (c), collectively, the "Pro Rated Items") have been paid by Seller at any time on or prior to the Closing Date and are attributable in whole or in part to any period of time following the Closing, Buyer shall pay to Seller at the Closing the amounts relating to post-Closing Date periods; provided, however, that final payments with respect to Pro Rated Items that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter.

2.6.1.4    Additional Fixtures.  As consideration for the Additional Fixtures, Buyer shall pay to Seller an amount equal to Ten Thousand Dollars U.S. ($10,000) plus Seller's reasonable out-of-pocket costs (not to exceed $50,000) for moving the Additional Fixtures to Retail Stores.

2.6.1.5    Sales of Spring 2 Inventory.  Seller shall hold in trust for Buyer and pay to Buyer at Closing an amount equal to (a) Seller's aggregate cost for all items of Spring 2 Inventory sold by Seller prior to the Closing through any of its retail stores or its ecommerce channel and (b) any payment received by Seller with respect to any Nordstrom Receivable prior to the Closing.

2.6.2    Deposit.  Concurrently with the mutual execution and delivery of this Agreement, Buyer shall deliver to counsel for Buyer a deposit in the amount of One Hundred Thousand Dollars U.S. ($100,000) (the "Cash Deposit") to be held in trust by Buyer's counsel pending Closing or order of the Bankruptcy Court.  Buyer's counsel shall confirm receipt of the Cash Deposit within two (2) Business Days following execution of this Agreement. If Buyer is the purchaser approved by the Bankruptcy Court, the Cash Deposit shall be applied to Buyer's obligation to pay to Seller the aggregate amount of the payments contemplated by Section 2.6 above, and any excess shall be refunded to Buyer.  Buyer shall be entitled to return of the Deposit within five (5) days in the event (i) Buyer is not the purchaser approved by the Bankruptcy Court; (ii) Buyer terminates this Agreement pursuant to Article VI hereof; (iii) Seller breaches this Agreement; or (iv) the conditions set forth in Section 4.2 below are not satisfied. Otherwise, the Deposit shall be nonrefundable.

2.6.3    Sales Tax Obligations.  All federal, state, local or foreign sales, use, transfer or similar Taxes payable in connection with the sale of the Assets to Buyer, if any, shall be paid by Seller, and remitted to the appropriate taxing authorities by Seller, within 60 days of the Closing.

45334377v.14

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 22 of 72

# ARTICLE III – CLOSING

3.      Closing.  The Closing shall take place on a date to be agreed upon by Buyer and Seller not later than fifteen (15) days following entry of an order of the Bankruptcy Court approving the sale of the Assets to Buyer, but in no event later than March 30, 2016 as set forth in Section 7.2 below.  Buyer and Seller acknowledge that the sale of the Assets pursuant to this Agreement is exempt from the requirements of the California Commercial Code bulk sales law. On the Closing Date, title to the Assets shall be transferred to Purchaser.

3.1      Closing Costs.  All expenses incurred by Seller or Buyer with respect to the consummation of the transaction contemplated by this Agreement are to be borne and paid exclusively by the party incurring same.

3.2      Seller's Deliveries at Closing.  At the Closing, Seller shall deliver the following to Buyer:

3.2.1    A Sale Approval Order from the Bankruptcy Court presiding in the Bankruptcy Case in conformance with Article VI authorizing the sale of the Assets to Buyer free and clear of Liens.

3.2.2    Such bills of sale and assignments of interest memorializing the transfer of the Assets to Buyer, as required by Buyer in its reasonable discretion, including a trademark assignment agreement.

3.2.3    A certificate from Seller attesting and certifying that since the date of this Agreement, no wrongful actions have been taken by current or past employees, agents, officers, directors or representatives of Seller with respect to the Assets that may have resulted in material devaluation of the Assets.

3.2.4    All necessary consents and approvals of third parties as determined by and in a form acceptable to Buyer in its reasonable discretion, including consents to assignment of the Assumed Contracts for financial accommodations or containing licenses of Intellectual Property listed on Schedule 3.2.4.

3.2.5    Proof of payment of all of Seller's post-bankruptcy withholding and sales tax obligations to all state and federal taxing authorities.

3.2.6    Such further instruments as may be necessary to transfer the Assets to Buyer.

3.3      Buyer's Deliveries at Closing.  At the Closing, Buyer shall deliver the following to Seller:

3.3.1    Such assignment and assumption documents memorializing Buyer's assumption of the Assumed Leases and Assumed Contracts, as required by Seller in its reasonable discretion.

- 8 -

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 23 of 72

3.3.2   Instructions to Buyer's counsel to release to Seller from the Cash Deposit the lesser of the Cash Deposit and the aggregate amount payable to Seller in cash pursuant to Section 2.6.1 and to pay any remaining balance to Buyer.  Such payments shall be made by Buyer's counsel pursuant to wire instructions provided by Seller and Buyer at least three (3) Business Days prior to the Closing Date.

3.3.3   If the amounts payable to Seller in cash pursuant to Section 2.6.1 exceed the Cash Deposit, Buyer shall pay to Seller at Closing the amount of such excess pursuant to wire instructions provided by Seller to Buyer at least three (3) Business Days prior to the Closing Date.

3.4     Seller's Delivery of Certain Assets.  Immediately following the Closing, Seller will (i) make the Assets located at Seller's warehouse and headquarters office available for pick-up by Buyer or its common carrier and (ii) deliver to Buyer such keys, passwords and any other means of gaining access to the Retail Stores and the computers and systems located therein. Seller shall bear the risk of loss to the tangible Assets until they have been delivered to Buyer or its common carrier; thereafter, Buyer shall bear all risk of loss associated with such Assets and shall be solely responsible for procuring adequate insurance to protect against such loss.  Seller shall retain sufficient employees at its warehouse and headquarters for up to ten (10) days following the Closing Date to facilitate the transfer of assets contemplated by this Section 3.4.  Seller shall continue to maintain adequate insurance against loss associated with the Assets until they have been delivered to Buyer or its common carrier.  Notwithstanding the foregoing, Seller and Buyer acknowledge that it may be necessary to transfer the location of the Additional Fixtures to the Retail Stores prior to Closing and that for some interval of time pre-Closing such Additional Fixtures may be stored by Buyer.  Should that occur, Buyer agrees that it shall cover the costs to move and store the Additional Fixtures but that the change of possession of the Additional Fixtures does not convey title to those assets to Buyer.  In the event that Buyer is not the successful bidder at the auction contemplated in Section 6.1 below or this Agreement is otherwise terminated prior to Closing, Buyer shall make the Additional Fixtures available to either the successful bidder or Seller within five (5) Business Days following termination of this Agreement at the location or locations where such Additional Fixtures are then located.

## ARTICLE IV – CONDITIONS TO CLOSING

4.     Closing Conditions.

4.1     Seller's Conditions to Closing.  The Seller's obligations to transfer the Assets to Buyer shall be subject to the following conditions precedent:

4.1.1   Bankruptcy Court Approval.  The Bankruptcy Court shall have entered a Sale Approval Order in conformance with Article VI below authorizing the sale contemplated by this Agreement.

4.1.2   Representations.  Each of the representations of Buyer shall be true and correct.

4.1.3   Delivery.  Buyer shall have delivered to Seller the items required in Section 3.3.

- 9 -

45334377v.14

4.1.4 <u>Formation</u>. Buyer shall be formed, organized, validly existing, and in good standing under the laws of the state of its formation.

4.2 <u>Buyer's Conditions to Closing</u>. Buyer's obligations to accept the transfer of the Assets from Seller shall be subject to the following conditions precedent:

4.2.1 <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered a Sale Approval Order in conformance with <u>Article VI</u> below authorizing the sale contemplated by this Agreement.

4.2.2 <u>Representations</u>. Each of the representations of Seller shall be true and correct.

4.2.3 <u>Delivery</u>. Seller shall have delivered to Buyer the items required in <u>Section 3.2</u>.

4.2.4 <u>Covenants</u>. Seller shall be in compliance with each of the covenants contained in <u>Articles V</u>, <u>IX</u> and <u>X</u> below.

4.2.5 <u>Absence of Material Adverse Effect</u>. Since the date of this Agreement and prior to Closing, no Material Adverse Effect shall have occurred or no fact or circumstance exists or has been threatened that might reasonably be expected to cause a Material Adverse Effect in the future.

4.2.6 <u>Offer Letter</u>. Tina Canales shall have entered into an offer letter on terms mutually agreeable to her and Buyer prior to the entry of the Sale Approval Order and such offer letter shall remain in full force and effect.

4.2.7 <u>Nordstrom</u>. Purchase orders placed by Nordstrom, Inc. with Seller prior to the date of the Sale Approval Order for goods to be delivered during calendar year 2016 ("2016 Purchase Orders") shall reflect purchase commitments not materially less than those placed by Nordstrom through the same date in 2015 with respect to purchases for calendar 2015, and the 2016 Purchase Orders shall remain in full force and effect.

## ARTICLE V – PRE-CLOSING ACTIONS

5. <u>Pre-Closing Actions of Buyer and Seller</u>.

5.1 <u>Due Diligence</u>. Buyer and its representatives shall have full and free access to the Assets and Seller's Books and Records from the execution of this Agreement through the Closing.

5.2 <u>Disclosure to Parties</u>. Each party shall notify the other party in writing of any fact or condition that causes or constitutes a breach of either party's representations, warranties or covenants under this Agreement. Such disclosure shall not change or alter any obligation of the disclosing party under this Agreement.

- 10 -

5.3    <u>Notice to Creditors and Parties-in-Interest</u>. Seller shall provide good and sufficient notice of the transactions contemplated hereby, the terms of this Agreement and the filing of the Chapter 11 Case in a timely manner to all creditors and parties-in-interest, including, without limitation, any and all creditors, if any, holding Liens on the Assets, all persons employed by Seller at any time during the four (4) years prior to the filing of the Chapter 11 Case, any person who has threatened any legal action against Seller, including claims under the Song-Beverly Act, and the non-debtor parties to all Assumed Leases and Assumed Contracts.

## ARTICLE VI – BANKRUPTCY COVENANTS

6.    <u>Bankruptcy Court Approval</u>.

6.1    <u>Overbid Procedure</u>. Seller shall move the Bankruptcy Court for approval of the sale of the Assets through an auction before the Bankruptcy Court and obtain an order establishing an overbid procedure (the "<u>Sale Procedure Order</u>"). The Sale Procedure Order shall provide that (a) overbids to Buyer's offer as contained herein may be sought from interested parties, provided that Seller provides to Buyer the identity of any qualifying overbidder and a copy of any qualifying overbid at least three (3) Business Days' notice prior to the court hearing at which the overbid shall be made; (b) the minimum overbid shall be in the amount of Fifty Thousand Dollars U.S. ($50,000) plus assumption of the Assumed Contracts and Assumed Leases and payment of the amounts payable in cash pursuant to <u>Section 2.6.1</u> with subsequent overbids in minimum increments of Twenty-Five Thousand Dollars U.S. $25,000; (c) any interested bidder shall pre-qualify by tendering to Seller's counsel (i) satisfactory evidence of the overbidder's ability to purchase the Assets, and (ii) a cashier's check payable to Seller in the sum of One Hundred Thousand Dollars U.S. ($100,000) to be used by the successful bidder toward payment of the Purchase Price and all unsuccessful bidders' checks shall be returned to such bidder per the terms of the Sales Procedure Motion; (d) Buyer shall be determined to be the successful bidder so long as it matches the highest bid; (e) in the event that Buyer is not the successful bidder at the auction or the sale does not close due to Seller's breach, Buyer shall receive a fee in the amount of Fifty Thousand Dollars U.S. ($50,000), as and for its due diligence, paid as a super-priority administrative claim from the proceeds of any sale of the Assets.

6.2    <u>Entry of Sale Approval Order</u>. Seller shall file a motion (the "<u>Sale Motion</u>") with the Bankruptcy Court seeking entry of an order approving the sale of the Assets (the "<u>Sale Approval Order</u>"). The Closing shall be conditioned upon the entry of an order not later than March 18, 2016, approving the sale as contained herein, the terms of which shall be subject to the reasonable consent of Buyer, and which shall contain the following findings of fact and conclusions of law:

6.2.1    Approving the terms and conditions of this Agreement and the sale of the Assets to Buyer, including the assumption and assignment by the Seller of the Assumed Leases and Assumed Contracts;

6.2.2    Holding that the sale of the Assets to Buyer shall be free and clear of all Liens, pursuant to Bankruptcy Code Section 363;

6.2.3    Finding that the Assets are property of Seller's estate;

- 11 -

6.2.4    Finding that the Purchase Price constitutes a fair value for the Assets;

6.2.5    Finding that there is a sound business purpose for the transactions contemplated under this Agreement;

6.2.6    Holding that provisions of the Assumed Leases and Assumed Contracts purporting to modify the terms of such agreements based on the assignment to Buyer are unenforceable pursuant to Bankruptcy Code Section 365(f);

6.2.7    Holding that the sale of the Assets to Buyer shall be free and clear of all Liabilities and Claims (as defined in Bankruptcy Code Section 101) against Seller, whether or not the holder of such Claim has asserted such Claim or is presently aware of, or should be aware of, such Claim, to the fullest extent provided by law;

6.2.8    Finding that notice of the transactions contemplated hereby and of the terms of  this Agreement was good and sufficient and was provided timely to all creditors and parties-in-interest, including, without limitation, any and all creditors, if any, holding Liens on the Assets;

6.2.9    Authorizing and directing Seller to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

6.2.10  This Agreement and the transactions contemplated herein were negotiated at arms' length, that Buyer acted in good faith in all respects, and that Buyer is a buyer in good faith pursuant to the provisions of Bankruptcy Code Section 363(m); and

6.2.11  The Seller's assumption and assignment to Buyer of the Assumed Leases and Assumed Contracts is approved in accordance with Bankruptcy Code Section 365.

6.3      Seller shall use its best efforts to cause the Bankruptcy Court to enter the Sale Approval Order.  Seller will request this relief in the Sale Motion and believes that such relief is justified and appropriate.  Seller does not warrant or guaranty that any of these provisions in the Sale Approval Order will be approved by the Bankruptcy Court.

## ARTICLE VII – TERMINATION

7.      The parties may terminate this Agreement as provided below.

7.1      Buyer and Seller may terminate this Agreement by mutual consent prior to the Closing.

7.2      This Agreement may be terminated (1) by either party if a material breach of any provision of this Agreement has been committed by the other party and the breach has not been waived or cured prior to termination; (2) by Buyer, if any of the conditions in Section 4.4 has not been satisfied by the Closing, other than through the failure of Buyer to comply with its obligations under this Agreement; (3) by Seller, if any of the conditions in Section 4.3 has not been satisfied by the Closing, other than through the failure of the Seller to comply with its

- 12 -

obligations under this Agreement; or (4) by either party, if the Closing has not occurred by March 30, 2016. In the event of termination under clause (1), the breaching party shall remain liable for all damages arising from its breach, notwithstanding termination of this Agreement by the non-breaching party; provided that Buyer's liability shall be limited in accordance with Section 10.2 and Seller's liability for money damages following termination of this Agreement by Buyer under clause (1) shall not exceed One Hundred Thousand Dollars U.S. ($100,000). Notice of termination shall be sent by the terminating party to the other party, via certified mail, receipt requested and by facsimile transmission. The parties understand that TIME SHALL BE OF THE ESSENCE with respect to the performance of Buyer's and Seller's obligations hereunder, provided that, any such breach by a party shall trigger an obligation by the non-breaching party to provide prompt notice to the breaching party of the alleged breach (to the extent that the non-breaching party is aware thereof and to the extent that such alleged breach is curable), including a detailed description of the facts and circumstances giving rise to such alleged breach, and the breaching party shall have a period of five Business Days following receipt of such notice to cure the alleged breach (but in any event to have been completed no later than the day preceding the Closing).

## ARTICLE VIII – REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

8.     Buyer represents, warrants and covenants to the Seller, which representations, warranties and covenants shall survive the Closing, as follows:

8.1     Authorization. The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by Buyer, and this Agreement constitutes the valid binding obligation of Buyer. This Agreement is subject to approval of the Bankruptcy Court, and is enforceable against Buyer in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application which may affect the enforcement of creditors rights generally and by general equitable principles.

8.2     No Violation. Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation of any rule, regulation, order, judgment or decree of any court or of any local government.

8.3     Litigation. There is no litigation, nor any order, decree or judgment, in progress or pending, or to the knowledge of Buyer, threatened, against or relating to Buyer and to Buyer's knowledge, no facts or circumstances exist which would reasonably be expected to give rise to litigation which would prevent, restrain or affect Buyer's ability to perform the transaction contemplated by this Agreement.

8.4     Disclaimer of Warranties; "AS IS AND WHERE IS" Conveyance. BUYER IS PURCHASING THE ASSETS IN AN "AS-IS AND WHERE IS" CONDITION WITH ALL FAULTS AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE OR ON BEHALF OF THE SELLER.

45334377v.14

8.5    Covenants of Buyer.  Buyer agrees as follows with respect to the period between the execution of this Agreement and the Closing:

8.5.1    Buyer will promptly notify Seller in writing of any event that would render any representation or warranty of Buyer contained in this Agreement, if made on or as of the date of that event or the Closing, untrue or inaccurate in any material respect.

8.5.2    Buyer shall use commercially reasonable efforts to provide, to the extent necessary, evidence of its ability to provide adequate assurance of future performance of the obligations under the Assumed Leases and Assumed Contracts as required by Section 365 of the Bankruptcy Code.

8.5.3    Buyer will use commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent to the Closing hereunder, and to cause the transactions contemplated hereby to be consummated.

## ARTICLE IX – REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

9.    Seller represents, warrants and covenants to Buyer as of the date hereof and as of the Closing, which representations, warranties and covenants shall survive the Closing, as follows:

9.1    Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

9.2    Authorization.  The execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby have been duly authorized by Seller and this Agreement constitutes the valid binding obligation of Seller.  This Agreement is subject to approval of the Bankruptcy Court, and is enforceable against Seller in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application which may affect the enforcement of creditors rights generally and by general equitable principles.

9.3    No Violation.  Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation of any rule, regulation, order, judgment or decree of any court or of any local government.

9.4    Litigation.  Except as set forth on Schedule 9.4, there is no litigation, nor any order, decree or judgment, in progress or pending, or to the Knowledge of Seller, threatened, against or relating to Seller or the Assets and to Seller's Knowledge, no facts or circumstances exist which would reasonably be expected to give rise to litigation.  There is no existing default by Seller with respect to any judgment, order, writ, injunction or decree of any Governmental Entity or arbitrator.

9.5    Assumed Leases and Assumed Contracts.  True and complete copies of the Assumed Leases and Assumed Contracts, together with all amendments and supplements thereto and all waivers of any terms thereof, have been made available to Buyer prior to the execution of this Agreement. Except as set forth on Schedule 9.5 and except for any default arising as a result of

- 14 -

45334377v.14

the commencement of the Chapter 11 Case, subject to payment of any Cure Costs, each Assumed Contract is valid, binding and in full force and effect, and is enforceable by Seller, as applicable, in accordance with its terms. Except as set forth on <u>Schedule 9.5</u> and except for any default arising as a result of the commencement of the Chapter 11 Case, subject to payment of any Cure Costs, Seller and, to the Knowledge of Seller, each counterparty to any Assumed Contract, has performed in all material respects the obligations required to be performed by it to date and is not in default under each Assumed Contract to which it is a party. Seller has not received any notice of default under any Assumed Contract to which it is a party. Except as set forth on <u>Schedule 9.5</u>, as of the date hereof, Seller is not in negotiations or discussions to amend, or contemplating the amendment of, any Assumed Contract that have not been already disclosed to Buyer during due diligence. Seller is not a party to or bound by any non-competition agreement that materially impairs its ability to operate the Business.

    9.6    <u>Financial Statements and Books and Records</u>. The Financial Statements have been prepared in accordance with Seller's accounting policies applied on a consistent basis, and fairly present, in all material respects, as of the dates thereof and for the periods then ended, the financial condition and results of operations of Seller. To the Knowledge of Seller, the Books and Records are all of the books, records and recorded information related to the Business.

    9.7    <u>Absence of Changes</u>. Since February 1, 2015, Seller has not: (i) transferred or granted any rights or options in or to any of the Assets, except for the transfer of Inventory in the ordinary course of business or (ii) transferred to any third party any rights under any licenses, sublicenses or other agreements with respect to any of Seller's intellectual property.

    9.8    <u>Taxes</u>. Seller has timely filed all material returns, declarations, reports, information returns and statements required to be filed by it in respect of any Taxes relating to or arising from the Business and/or the Assets and paid all Taxes relating to or arising from the Business and/or the Assets due and payable by it through the date hereof. Seller has not received written notice of any material proposed Tax deficiency, assessment or levy arising from the Business and/or the Assets. Seller has duly withheld from each payment from which such withholding is required by law the amount of all Taxes relating to or arising from the Business and/or the Assets required to be withheld therefrom and has paid the same (to the extent due), together with the employer's share of the same, if any, to the proper Tax receiving officers.

    9.9    <u>Title to Assets</u>. Upon the consummation of the transactions contemplated hereby, Buyer shall acquire all right, title and interest of Seller in and to, the Assets, free and clear of all Liens.

    9.10    <u>Intellectual Property</u>.

        9.10.1    Except as set forth on <u>Schedule 9.10.1</u>, Seller has all right, title and interest in and to the Intellectual Property owned by Seller, free and clear of all Liens.

        9.10.2    To the Knowledge of Seller, each item of Intellectual Property is valid, subsisting, in full force and effect, and has not been abandoned or passed into the public domain, and all necessary registration, maintenance and renewal documentation and fees in

45334377v.14

connection with Registered Intellectual Property have been timely filed with the appropriate authorities and paid.

9.10.3 Except as set forth on <u>Schedule 9.10.3,</u> to the Knowledge of Seller, there are no claims, actions, suits, proceedings, arbitrations, orders, inquiries, hearings or assessments before any court, tribunal (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) or other Governmental Entity other than proceedings related to usual and customary patent or trademark prosecutions in the ordinary course of business ("<u>Proceedings</u>") relating to any Intellectual Property, and no Intellectual Property is subject to any outstanding decree, order, judgment, agreement or stipulation restricting in any manner the use, transfer or licensing thereof or that may affect the validity, use or enforceability of the Intellectual Property. Seller has no Knowledge of any facts, circumstances or information that would render the Registered Intellectual Property invalid or unenforceable, would adversely affect any pending application for any Registered Intellectual Property, or would materially adversely affect or materially impede Buyer's ability to use any Intellectual Property in the manner used or held for use in the conduct or operation of the Business as currently conducted.

9.10.4 To the Knowledge of Seller, no Person has infringed or misappropriated, or is infringing or misappropriating, the Intellectual Property. Seller has not received written notice from any Person and has no Knowledge that the use of the Intellectual Property has infringed or misappropriated, or infringes or misappropriates, the intellectual property of any Person or has constituted or constitutes unfair competition or trade practices under the laws of any jurisdiction.

9.10.5 To the Knowledge of Seller, no present or former employee or consultant of Seller owns or has any proprietary financial or other interest, direct or indirect, in the Intellectual Property.

9.10.6 Seller has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of any Seller trade secrets or confidential information included in the Intellectual Property, including having and enforcing a policy requiring employees, consultants and other independent contractors to execute confidentiality and intellectual property assignment agreements.

9.10.7 The Intellectual Property constitutes all of the intellectual property rights owned, exclusively licensed or otherwise controlled, used or held for use by Seller in the conduct or operation of the Business as currently conducted.

9.11 <u>Compliance with Law</u>. Seller has conducted the Business in compliance in all material respects with all applicable Permits, orders, injunctions, decrees, laws, regulations, guidance and guidelines. Seller has not received any written notice to the effect that, or otherwise been advised that, it is not currently in compliance with any of such Permits, orders, injunctions, decrees, laws, regulations, guidance or guidelines.

9.12 <u>Inventory</u>. All of the Inventory is valued on the Balance Sheet at cost and reflects write-downs to realizable values in the case of items which are below standard quality or have become obsolete or unsaleable (except at prices with less than normal gross margins). The Inventory

- 16 -

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 31 of 72

is of good and merchantable quality, fit for the purpose for which it is intended and saleable and useable in the ordinary course of business. All of the items of Inventory (subject to the reserves described above) meet Seller's current standards and specifications. None of the Inventory covered by Section 2.1.1 or 2.1.2 hereof includes any merchandise using any images, artwork, designs, trademarks or other intellectual property described in the License Agreement dated December 2, 2013, as amended to date, between Seller and Disney Consumer Products, Inc., or merchandise that would otherwise infringe on the intellectual property rights of Disney Consumer Products, Inc. or its affiliates if such merchandise were sold without an effective license from Disney Consumer Products, Inc.

      9.13    <u>Covenants of Seller</u>. Seller agrees as follows with respect to the period between the execution of this Agreement and the Closing:

      9.13.1 From the time it executes this Agreement, except for liquidation of the tangible assets (other than the Additional Fixtures) at the retail stores not within the definition of Retail Stores, Seller shall operate its business in its normal and customary manner, and shall not transfer any of its assets except in the ordinary course of business.

      9.13.2 Seller will promptly notify Buyer in writing and in sufficient detail to allow Buyer to make an informed decision of any event occurring subsequent to the date of this Agreement that would render any representation or warranty of Seller contained in this Agreement, if made on or as of the date of that event or the Closing, untrue or inaccurate in any material respect.

      9.13.3 Seller will use its best effort to satisfy or cause to be satisfied all the conditions precedent to the Closing hereunder, and to cause the transactions contemplated hereby to be consummated.

      9.13.4 Seller shall protect and preserve the Assets, use them only in their normal and customary manner in the ordinary course of their business, and not remove the Assets from their ordinary location.

      9.13.5 Seller shall diligently carry on Seller's business and activities in substantially the same manner as it previously has been carried on in the ordinary course of business, and Seller shall not enter into any contracts, purchases, transfers or sales outside the normal, ordinary course of business without Buyer's prior approval.

      9.13.6 Seller shall use its best efforts to preserve Seller's business and to preserve Seller's present relationships with suppliers, customers and others having business relationships with Seller.

      9.13.7 Subject to any limitations under the Bankruptcy Code or the Bankruptcy Court, Seller shall timely pay all vendors, suppliers and employees, including timely paying all Taxes and withholdings.

      9.13.8 Seller will not sell, transfer or dispose of any of the Assets except in the ordinary course of business or pursuant to this Agreement.

- 17 -

Case: 16-30146   Doc# 15   Filed: 02/05/16   Entered: 02/05/16 22:27:39   Page 32 of 72

9.13.9  Seller will not modify, amend, cancel or terminate any of the Assumed Leases or Assumed Contracts.

9.13.10    Seller shall provide appropriate notice of termination of, and shall terminate, the employment of each of Seller's employees on or prior to the date of Closing in an appropriate and legal manner; provided that termination of the warehouse and headquarters employees referenced in Section 3.4 shall be deferred until the end of the period specified in such section.  Seller shall hold at least one "all-employees" meeting prior to the Closing advising its employees of the sale of Assets hereunder.  Seller shall allow Buyer's representative to attend such meeting(s) and communicate to Seller's employees Buyer's intention to hire workers for its operations to be conducted following the Closing.  Buyer may, but shall have no obligation to, hire any of Seller's employees.

9.13.11    No later than fifteen (15) days following the Closing Date, Seller shall change its name to a name that does not include the word "Peek" or the phrase "Aren't You Curious."

9.13.12    Seller shall track the cost of any items of Spring 2 Inventory sold by Seller through any of its retail stores or its ecommerce channel prior to Closing.

## ARTICLE X – SPECIAL COVENANTS AND CONDITIONS

10.    The following special covenants and conditions shall apply to this Agreement and the transaction contemplated by this Agreement:

10.1    Indemnification for Taxes.  Seller shall indemnify and hold Buyer harmless from any Liability for Taxes of any nature whatsoever arising with respect to the Assets or Seller's business arising or accruing, or based on Seller's ownership or possession of the Assets, prior to the Closing, including but not limited to income taxes, payroll taxes, personal property taxes, duties, customs, and use or sales taxes.

10.2    Liquidated Damages.  Buyer understands and agrees that Seller will incur certain legal and administrative costs to proceed with this transaction to obtain Bankruptcy Court approval, and that Seller's damages upon Buyer's breach of this Agreement would be difficult to precisely calculate.  Accordingly, Buyer agrees that the cash deposit referred to in Section 2.6.2 shall, upon Buyer's failure to close the transaction according to the terms hereof, be retained by Seller as liquidated damages for Buyer's breach hereof.

_____ Buyer    _____ Seller

## ARTICLE XI – GENERAL PROVISIONS

11.    General Provisions.

11.1    Representation of Comprehension of Document.  In entering into this Agreement, the parties warrant and represent that: (i) they have read the contents of this Agreement; (ii) the terms of this Agreement have been explained to them by their respective

45334377v.14

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 33 of 72

attorneys; (iii) those terms are fully understood and voluntarily accepted by them; (iv) they have relied upon the legal advice of their own choosing; and (v) no party shall deny the validity of this Agreement on the ground that it/they did not have the advice of its/their counsel.

11.2    Representation of Authority to Enter Agreement.  Each of the undersigned represents that they have authority to enter into this Agreement and execute its terms.

11.3    Merger and Modification.  This Agreement, including the Schedules and Exhibit(s) hereto, contains the entire understanding of the parties hereto in respect to the subject matter hereof, and there are no other agreements modifying its terms.

11.4    Amendment.  This Agreement may only be amended or modified by written consent of both parties.  Any amendment or modification shall become effective in accordance with its terms after such modification or amendment is appropriately approved and such modification or amendment is sent to each of the parties.

11.5    Governing Law.  The parties acknowledge and agree that the conditions, validity and enforceability of any terms or provisions of this Agreement shall be determined by the laws of the State of California governing contracts entered into and to be performed in the State of California, and the Bankruptcy Code, Title 11, United States Code.

11.6    Venue.  Any action to enforce, interpret or challenge the terms of this Agreement shall be brought in the Bankruptcy Court presiding in the Bankruptcy Cases, or any court of competent jurisdiction in the County of San Francisco, California.

11.7    Interpretation of Agreement.  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any party.  The parties agree that California Civil Code Section 1654 shall not apply to the terms of this Agreement.

11.8    Attorneys' Fees and Costs.  If any of the parties hereto commences any action to enforce, interpret or challenge the terms of this Agreement, then each of the parties hereto hereby agrees that the prevailing party in any such action shall be entitled to recover its/their attorneys' fees and court costs, and other non-reimbursable litigation expenses, including expert witness fees and attorney and witness travel expenses, and including all attorneys' fees and costs incurred in enforcing any judgment or in collecting upon any amounts that may be awarded in any such action.

11.9    Notices.  All notices, requests and other communications required or permitted hereunder shall be in writing (which shall include communications by telex and telecopier); shall be deemed to have been given when delivered by hand, telecopy (followed by mailed notices as hereinafter provided), overnight delivery service, with acknowledged receipt, or when deposited in the United States mail if sent by registered or certified mail, postage prepaid, return receipt requested, addressed to a party at the addresses set forth for that party on the signature page of this Agreement with copies (which shall not constitute notice) to the individuals or entities designated by the party on the signature page of this Agreement, or such other address which the party shall have given in writing for such purpose by notice hereunder.

- 19 -

11.10    Further Documents.  The parties agree to promptly perform such further acts and to execute and deliver any and all further documents that may reasonably be necessary or desirable to effectuate the purpose of this Agreement.

11.11    Severability.  Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law of any jurisdiction or any rule or regulation of any governmental authority, such invalidity shall not impair the operation of or affect those provisions in any other jurisdiction or any other provisions hereof which are valid.

11.12    Third Parties.  Nothing herein shall be construed to be to the benefit of or enforceable by any third party.

11.13    Assignment.  This Agreement may not be assigned by either party without the prior written consent of the other party.

11.14    Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall constitute one in the same instrument, and any party hereto may execute this Agreement by signing one or more counterparts.  Notwithstanding the foregoing, the releases contained herein are intended to and shall become effective only when this Agreement has been executed by all of the parties hereto, and the Closing has occurred.

11.15    Time of the Essence.  Time is strictly of the essence in this Agreement.

11.16    Interpretation.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.17    Costs and Expenses.  Buyer shall pay its costs and expenses, including without limitation, the fees and expenses of its counsel, financial advisors or finder.  Seller shall pay the costs and expenses incurred by Seller, including without limitation, the fees and expenses of legal, accounting and financial advisors to Seller, as well as any brokers' fees for any broker engaged by Seller or any of their affiliates in connection with the transactions contemplated hereby.

[SIGNATURE PAGE FOLLOWS]

- 20 -

IN WITNESS WHEREOF, this Agreement is executed as of the day and year first above set forth.


SELLER:                                    BUYER:

PEEK, AREN'T YOU CURIOUS, INC., a          CHARLOTTE RUSSE, INC., a California
California corporation                     corporation



By:_____       By:_____
Name:                                       Name:
Its:                                        Its:

45334377v.14

**Schedule 1.1(a)**
**Registered Copyrights**

45334377v.14

1

**Schedule 1.1(b)**
**Domain Names**

Peekkids.com
Peekarentyoucurious.com
mypeekkid.com
peekchildren.com
peekclothes.com
peekcurious.com
peekforkids.com
peekinc.com
peekkids.co.nz
peekkids.co.uk
peekkids.net
peekkids.org
peekkids.eu
peekkids.jp

**Schedule 1.1(c)**
**Knowledge**

Tina Canales
Jason Klein
Whitney Valentine-Wafer
Karen Bottaro

# PEEK, AREN'T YOU CURIOUS, INC.

Trademark Status Chart

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|---|---|---|---|---|---|
| **UNITED STATES** | | | | | |
| **FLEUR DES CHAMPS** | USA | App. No. 86/848,312 | Int'l Class 25: Children's clothing, namely, shirts, sweaters, skirts, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweat shirts, sweat suits, sweat pants, socks, shorts, bathing suits, beachwear, jackets, coats.<br><br>First Use: ITU<br>First Use in Commerce: ITU | Filed 12/14/2015<br><br>Owner: Peek . . . Aren't You Curious, Inc. | 06/14/2016 Foreign filing priority deadline<br><br>07/01/2016 Check status of application |
| **LITTLE PEANUT** | USA | App. No. 77/516,379<br><br>Reg. No. 3,630,079 | Int'l Class 25: Children's clothing, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, skirts, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweat shirts, sweat suits, sweat pants, socks, shorts, bathing suits, beachwear, jackets, coats.<br><br>First Use: 06/15/2006<br>First Use in Commerce: 01/25/2007 | Filed 07/07/2008<br><br>Registered 06/02/2009<br><br>Declaration of Use filed 06/02/2015<br><br>Owner: Peek . . . Aren't You Curious, Inc | 06/02/2019 Renew registration |
| **LITTLE PEANUT** | USA | App. No. 86/185,079 | Int'l Class 24: Blankets, bed spreads, bed sheets, comforters, | Filed 02/05/2014 | 08/12/2016 File Statement of Use or |

45334377v.14

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|------|---------|-------------|----------------------|--------|-----------------|
| | | | and bedding layettes consisting of crib bumpers, quilts, baby blankets, and crib sheets; towels and washcloths.<br><br>First Use:  ITU<br>First Use in Commerce:  ITU | Published 06/17/2014<br><br>Allowed 08/12/2014<br><br>Extension filed 01/26/2016 | Extension |
| **PEEK** | USA | App. No. 86/185,372 | Int'l Class 14:  Watches; jewelry, namely, bracelets, charms, earrings, key chains as jewelry, necklaces, rings; jewelry boxes.<br><br>Int'l Class 16:  Books for children and infants, namely, song books, story books, and a series of books relating to children's play activities and education; children's books; children's interactive books; flash cards.<br><br>Int'l Class 18:  Backpacks and tote bags; purses, coin purses, and wallets.<br><br>Int'l Class 20:  Picture frames; toy boxes and chests. | Filed 02/05/2014<br><br>Office Action issued 05/20/2014; Response filed 11/19/2014<br><br>Examiner's Amendment issued 12/04/2014<br><br>Published 01/13/2015<br><br>Allowed 03/10/2015<br><br>Extension  (deleting Classes  03 and 09) filed 01/28/2016 | 09/10/2016 File Statement of Use or Extension |

45334377v.14

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 41 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|------|---------|-------------|----------------------|--------|-----------------|
| | | | Int'l Class 24: Blankets, namely, bed blankets; bed spreads; bed sheets; comforters; and bedding layettes consisting of crib bumpers; quilts; baby blankets; and crib sheets; towels and washcloths. | | |
| | | | Int'l Class 26: Hair accessories, namely hair bands, hair bows, hair ornaments, hair pins, hair ribbons, hair claw clips, and hair barrettes. | | |
| | | | Int'l Class 28: Toys, namely, bubble making wands and solution sets, building blocks, bath toys, crib toys, dolls, educational toys, namely, games in the nature of educational card games and board games, puzzles, flash cards, and instructional games in the nature of educational card games and board games; finger puppets, musical toys, party favors in the nature of small toys, play mats for use with toys and children's games, namely, play mats used with toy vehicles, play mats used with paper or toy dolls, play mats that are also games, play mats that can be colored or decorated, puppets, rubber balls, spinning tops, toy stuffed animals and characters, | | |

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 42 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|------|---------|-------------|------------------------|--------|------------------|
| | | | namely, soft plush toys of all varieties of animals and dolls, people-like toys and dolls that are stuffed, stuffed letters used together, toy vehicles.<br><br>First Use:  ITU<br>First Use in Commerce:  ITU | | |
| **PEEK** | USA | App. No. 86/185,072 | Int'l Class 25:  Clothing and accessories for women, infants and children, namely, bathing suits, beachwear, baby bibs not of paper, bandanas, bloomers, blouses, bonnets, caps, coats, separates, namely, t-shirts, button-up shirts, pullovers, crew neck sweaters and sweat shirts, pants, corduroys, shorts, skirts, jumpers, rompers, tank tops, thermals in the nature of thermal underwear, leggings, skirts with built-in undershorts, polo shirts, dress pants, jackets, blazers, wraps, shawls, ponchos, tights, dresses, hats, knit tops, jeans, jumpsuits, leotards, loungewear, mittens, gloves, overalls, sport coats, suits, rain jackets, robes, scarves, shirts, ski jackets, ski pants, turtlenecks, sleepwear, smocks, snow suits, socks, sweaters, sweatpants, sweatshirts, tops, underwear, waist belts, woven | Filed 02/05/2014<br><br>Office Action issued 05/20/2014; Response filed 11/20/2014<br><br>Examiner's Amendment issued 11/25/2015<br><br>Published 01/13/2015<br><br>Allowed 03/10/2015<br><br>Extension filed 01/28/2016 | 09/10/2016 File Statement of Use or Extension |

Case: 16-30146   Doc# 15   Filed: 02/05/16   Entered: 02/05/16 22:27:39   Page 43 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|---|---|---|---|---|---|
| | | | shirts; footwear for infants and children, namely, athletic shoes, booties, boots, sandals, shoes, slippers, sneakers.<br><br>First Use:  ITU<br>First Use in Commerce:  ITU | | |
| **PEEK** | USA | App. No. 77/764,277<br><br>Reg. No. 3,868,335 | Int'l Class 25:  Children's clothing, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, sweatpants, sweat suits, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweatshirts, socks, shorts, bathing suits, beachwear, sweaters, rain jacket, ski jacket, coats.<br><br>First Use:  03/01/2010<br>First Use in Commerce: 03/01/2010<br><br>Int'l Class 35:  Mail order catalog services featuring children's apparel, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, sweatpants, sweat suits, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweatshirts, socks, shorts, bathing suits, beachwear, sweaters, rain jacket, | Filed 06/19/2009<br><br>Registered 10/26/2010<br><br>Owner:  Peek . . . Aren't You Curious, Inc. | 10/26/2016 File Declaration of Use<br><br>10/26/2020 Renew registration |

Case: 16-30146   Doc# 15   Filed: 02/05/16   Entered: 02/05/16 22:27:39   Page 44 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|---|---|---|---|---|---|
| | | | ski jacket, coats, books and accessories therefor; on-line retail store services featuring children's apparel, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, sweatpants, sweat suits, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweatshirts, socks, shorts, bathing suits, beachwear, sweaters, rain jacket, ski jacket, coats, books and accessories.<br><br>First Use:  01/01/2010<br>First Use in Commerce: 01/01/2010 | | |
| **PEEK . . . & Design**<br><br> | USA | App. No. 86/185,080 | Int'l Class 25:  Clothing and accessories for women, infants and children, namely, bathing suits, beachwear, baby bibs not of paper, bandanas, bloomers, blouses, bonnets, caps, coats, separates, namely, t-shirts, button-up shirts, pullovers, crew neck sweaters and sweat shirts, pants, corduroys, shorts, skirts, jumpers, rompers, tank tops, thermals in the nature of thermal underwear, leggings, skirts with built-in undershorts, polo shirts, dress pants, jackets, blazers, wraps, shawls, ponchos, tights, dresses, hats, knit tops, jeans, | Filed 02/05/2014<br><br>Office Action issued 05/20/2014; Response filed 11/20/2014<br><br>Examiner's Amendment issued 11/25/2015<br><br>Published 01/13/2015 | **REQUESTED UPDATED "NEXT ACTION" DATE FROM COBALT LAW** |

Case: 16-30146   Doc# 15   Filed: 02/05/16   Entered: 02/05/16 22:27:39   Page 45 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|---|---|---|---|---|---|
| | | | jumpsuits, leotards, loungewear, mittens, gloves, overalls, sport coats, suits, rain jackets, robes, scarves, shirts, ski jackets, ski pants, turtlenecks, sleepwear, smocks, snow suits, socks, sweaters, sweatpants, sweatshirts, tops, underwear, waist belts, woven shirts; footwear for infants and children, namely, athletic shoes, booties, boots, sandals, shoes, slippers, sneakers.<br><br>First Use:  ITU<br>First Use in Commerce:  ITU | Allowed 03/10/2015<br><br>Extension filed 09/09/2015<br><br>Extension filed 02/02/2016 | |
| **PEEK . . . AREN'T YOU CURIOUS** | USA | App. No. 77/687,923<br><br>Reg. No. 3,717,923 | Int'l Class 25:  Children's clothing, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, sweatpants, sweat suits, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweatshirts, socks, shorts, bathing suits, beachwear, sweaters, rain jacket, ski jacket, jackets, coats.<br><br>First Use:  01/26/2007<br>First Use in Commerce: 01/26/2007 | Filed 03/10/2009<br><br>Registered 12/01/2009<br><br>Declaration of Use filed 11/30/2015<br><br>Owner:  Peek . . . Aren't You Curious Inc. | 12/01/2019 Renew registration |
| **PEEK BABY** | USA | App. No. 86/185,074 | Int'l Class 25:  Clothing and accessories for infants and children, | Filed 02/05/2014 | 09/02/2016 File Statement of Use or |

45334377v.14

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|------|---------|-------------|----------------------|--------|-----------------|
| | | | namely, bathing suits, beachwear, baby bibs not of paper, bandanas, bloomers, blouses, bonnets, caps, coats, dresses, hats, gloves, knit tops, jeans, jumpsuits, leggings, leotards, loungewear, mittens, overalls, rain jackets, robes, scarves, shirts, shorts, ski jackets, sleepwear, smocks, snowsuits, socks, sweaters, sweatpants, sweatshirts, t-shirts, tights, tops, underwear, waist belts, woven shirts; footwear for infants and children, namely, athletic shoes, booties, sandals, shoes, slippers, sneakers.<br><br>First Use:  ITU<br>First Use in Commerce:  ITU | Office Action issued 05/15/2014<br><br>Examiner's Amendment issued 05/15/2014<br><br>Published 07/08/2014<br><br>Allowed 09/02/2014<br><br>Extension filed 01/28/2016 | Extension |
| **PEEK KIDS** | USA | App. No. 86/185,078 | Int'l Class 25:  Clothing and accessories for infants and children, namely, bathing suits, beachwear, baby bibs not of paper, bandanas, bloomers, blouses, bonnets, caps, coats, dresses, hats, gloves, knit tops, jeans, jumpsuits, leggings, leotards, loungewear, mittens, overalls, rain jackets, robes, scarves, shirts, shorts, ski jackets, sleepwear, smocks, snowsuits, socks, sweaters, sweatpants, sweatshirts, t-shirts, tights, tops, | Filed 02/05/2014<br><br>Office Action issued 05/15/2014<br><br>Examiner's Amendment issued 05/15/2014<br><br>Published 07/08/2014 | 09/02/2016 File Statement of Use or Extension |

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 47 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS | NEXT ACTION DUE |
|---|---|---|---|---|---|
| | | | underwear, waist belts, woven shirts; footwear for infants and children, namely, athletic shoes, booties, sandals, shoes, slippers, sneakers.<br><br>First Use:  ITU<br><br>First Use in Commerce:  ITU | Allowed 09/02/2014<br><br>Extension filed 01/28/2016 | |
| **SGT FLETCHER** | USA | App. No. 86/886,008 | Int'l Class 25:  Children's clothing, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, skirts, pants, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweat shirts, sweat suits, sweat pants, socks, shorts, bathing suits, beachwear, jackets, coats.<br><br>First Use:  ITU<br>First Use in Commerce:  ITU | Filed 01/25/2016<br><br>Owner:  Peek . . . Aren't You Curious Inc. | 07/25/2016 Foreign filing priority deadline<br><br>08/01/2016 Check status of application |

Case: 16-30146   Doc# 15   Filed: 02/05/16   Entered: 02/05/16 22:27:39   Page 48 of 72

| MARK | COUNTRY | APP/REG NO. | CLASS: GOODS/SERVICES | STATUS |
|---|---|---|---|---|
| **WILLIAMS AND SONS** | USA | App. No. 77/516,371<br><br>Reg. No. 3,829,750<br><br>Supplemental Register | Int'l Class 25: Children's clothing, namely, shirts, t-shirts, tops, woven shirts, knit tops, sweaters, skirts, jeans, blouses, dresses, jumpsuits, underwear, sleepwear, sweat shirts, sweat suits, sweat pants, socks, shorts, bathing suits, beachwear, jackets, coats.<br><br>First Use: 06/15/2006<br>First Use in Commerce: 01/25/2007 | Filed 07/07/2008<br><br>Registered 08/03/2010<br><br>Owner: Peek . . . Aren't You Curious Inc |

**Schedule 2.1.3**
**Assumed Leases**

1. "Retail Lease" between Etta Bacharach Testamentary A Trust, Barbara Jean Borsuk, Surviving Trustee; Etta Bacharach Testamentary B Trust, Barbara Jean Borsuk, Trustee; Sheila Siegel Trust, Sheila Siegel, Trustee; Sandrigham Properties LLC, Landlord and Peek, Aren't You Curious, Inc., Tenant, dated March 16, 2013, for approximately 1,440 square feet located at 2156 Chestnut Street, San Francisco, California

2. Lease between Park Meadows Mall LLC, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated June 12, 2013 for approximately 1,483 square feet located at 1000 Park Meadows, Lone Tree, Colorado.

3. "Lease Agreement" between Corte Madera Village, LLC, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated June 6, 2007, for approximately 1,499 square feet located at Village Corte Madera, Corte Madera, California, as amended.

4. "Retail Lease" between the Irvine Company, LLC, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated November 16, 2007, for approximately 2,089 square feet located at 273 Newport Center Drive, Newport Beach, California, as amended.

5. "Standard Industrial/Commercial Multi-Tenant Lease – Net" between Pesho Montana Associates, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated September 28, 2006, for approximately 1,570 square feet located at 1015 Montana Avenue, Santa Monica, California, as amended.

6. "Shopping Center Lease" between NorthPark Partners, LP, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated August 6, 2008, for approximately 1,866 square feet located at NorthPark Mall, Dallas, Texas.

7. "Lease Agreement" between University Village Limited Partnership, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated February 24, 2012 for approximately 1,413 square feet located at University Village, Seattle, Washington.

8. "Storage Agreement" between University Village Limited Partnership, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated February 6, 2015, for Storage Space STO-13 located in the Clocktower Building at University Village, Seattle, Washington.

9. "Lease Agreement" between Kierland Greenway, LLC, Landlord, and Peek, Aren't You Curious, Inc., Tenant, dated June 28, 2007 for approximately 1,561 square feet located at Kierland Commons, Phoenix, Arizona, as amended.

**Schedule 2.1.4**
**Assumed Contracts**

1. Service Level Agreement Quest Managed Services between Quest Media and Supplies, Inc. and Peek Aren't You Curious, dated August 1, 2014.

2. Card Services Agreement (consisting of Card Services Terms & Conditions and Merchant Application) by and among Global Payments Direct, Inc., Wells Fargo Bank and Peek Aren't You Curious, Inc. dated March 17, 2015.

3. Gift Card Application and Gift Card Terms and Conditions  between Mercury Payment Systems, LLC and Peek Aren't You Curious, Inc. dated May 27, 2012.

4. Order Form and Software License Agreement between X.commerce, Inc. (Formerly Magento, Inc.) and Peek…Aren't You Curious as Licensee, dated April 17, 2012.

5. Software License Agreement between Island Pacific Systems, Inc. and Peek Aren't You Curious, dated March 30, 2012, as amended.

6. Software Support Agreement between Island Pacific Systems, Inc. and Peek Aren't You Curious, dated March 30, 2012.

7. Managed Services Agreement between Island Pacific Systems, Inc. and Peek Aren't You Curious, dated March 30, 2012.

8. The supply purchase orders/commitments for Spring 2 Inventory listed on Exhibit A to this Schedule 2.1.4.

**Exhibit A to Schedule 2.1.4**
**Spring 2 Inventory Purchase Orders**

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000016592 | 20178 | MOSGEN |
| 0000016661 | 20253 | SOLSTICE INDIA |
| 0000016663 | 20253 | SOLSTICE INDIA |
| 0000016665 | 20253 | SOLSTICE INDIA |
| 0000016906 | 20243 | SHROFF & CO. LTD. |
| 0000016908 | 20243 | SHROFF & CO. LTD. |
| 0000016953 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016955 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017028 | 20384 | TAILGATE CLOTHING CO. |
| 0000017030 | 20384 | TAILGATE CLOTHING CO. |
| 0000017032 | 20384 | TAILGATE CLOTHING CO. |
| 0000017034 | 20384 | TAILGATE CLOTHING CO. |
| 0000017036 | 20384 | TAILGATE CLOTHING CO. |
| 0000017038 | 20384 | TAILGATE CLOTHING CO. |
| 0000017040 | 20384 | TAILGATE CLOTHING CO. |
| 0000017102 | 20018 | ASA TEXTILE |
| 0000017104 | 20018 | ASA TEXTILE |
| 0000017106 | 20018 | ASA TEXTILE |
| 0000017210 | 20178 | MOSGEN |
| 0000017211 | 20178 | MOSGEN |
| 0000017221 | 20384 | TAILGATE CLOTHING CO. |
| 0000017222 | 20384 | TAILGATE CLOTHING CO. |
| 0000017223 | 20384 | TAILGATE CLOTHING CO. |
| 0000017224 | 20384 | TAILGATE CLOTHING CO. |
| 0000017225 | 20384 | TAILGATE CLOTHING CO. |
| 0000017226 | 20384 | TAILGATE CLOTHING CO. |
| 0000017227 | 20384 | TAILGATE CLOTHING CO. |
| 0000017228 | 20384 | TAILGATE CLOTHING CO. |
| 0000017229 | 20384 | TAILGATE CLOTHING CO. |
| 0000017264 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017283 | 20243 | SHROFF & CO. LTD. |
| 0000017289 | 20243 | SHROFF & CO. LTD. |
| 0000017290 | 20243 | SHROFF & CO. LTD. |
| 0000017291 | 20243 | SHROFF & CO. LTD. |
| 0000017309 | 20253 | SOLSTICE INDIA |
| 0000017310 | 20253 | SOLSTICE INDIA |
| 0000017311 | 20253 | SOLSTICE INDIA |
| 0000017312 | 20253 | SOLSTICE INDIA |

45334377v.14

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000017313 | 20253 | SOLSTICE INDIA |
| 0000017314 | 20253 | SOLSTICE INDIA |
| 0000017496 | 20018 | ASA TEXTILE |
| 0000017497 | 20018 | ASA TEXTILE |
| 0000016591 | 20178 | MOSGEN |
| 0000016660 | 20253 | SOLSTICE INDIA |
| 0000016662 | 20253 | SOLSTICE INDIA |
| 0000016664 | 20253 | SOLSTICE INDIA |
| 0000016905 | 20243 | SHROFF & CO. LTD. |
| 0000016907 | 20243 | SHROFF & CO. LTD. |
| 0000016952 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016954 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017029 | 20384 | TAILGATE CLOTHING CO. |
| 0000017031 | 20384 | TAILGATE CLOTHING CO. |
| 0000017033 | 20384 | TAILGATE CLOTHING CO. |
| 0000017035 | 20384 | TAILGATE CLOTHING CO. |
| 0000017037 | 20384 | TAILGATE CLOTHING CO. |
| 0000017039 | 20384 | TAILGATE CLOTHING CO. |
| 0000017041 | 20384 | TAILGATE CLOTHING CO. |
| 0000017101 | 20018 | ASA TEXTILE |
| 0000017103 | 20018 | ASA TEXTILE |
| 0000017105 | 20018 | ASA TEXTILE |
| 0000017568 | 20384 | TAILGATE CLOTHING CO. |
| 0000017569 | 20384 | TAILGATE CLOTHING CO. |
| 0000017570 | 20384 | TAILGATE CLOTHING CO. |
| 0000017571 | 20384 | TAILGATE CLOTHING CO. |
| 0000017572 | 20384 | TAILGATE CLOTHING CO. |
| 0000017580 | 20384 | TAILGATE CLOTHING CO. |
| 0000017581 | 20384 | TAILGATE CLOTHING CO. |
| 0000017613 | 20178 | MOSGEN |
| 0000017703 | 20243 | SHROFF & CO. LTD. |
| 0000017714 | 20243 | SHROFF & CO. LTD. |
| 0000017750 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017763 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017767 | 20253 | SOLSTICE INDIA |
| 0000017768 | 20253 | SOLSTICE INDIA |
| 0000017769 | 20253 | SOLSTICE INDIA |
| 0000017848 | 20018 | ASA TEXTILE |
| 0000017849 | 20018 | ASA TEXTILE |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000017850 | 20018 | ASA TEXTILE |
| 0000016672 | 20022 | AUHC |
| 0000016672 | 20022 | AUHC |
| 0000016674 | 20022 | AUHC |
| 0000016705 | 20253 | SOLSTICE INDIA |
| 0000016779 | 20017 | APPAREL UNITED |
| 0000016815 | 20171 | MH CONCEPTS |
| 0000016817 | 20171 | MH CONCEPTS |
| 0000016927 | 20018 | ASA TEXTILE |
| 0000016929 | 20018 | ASA TEXTILE |
| 0000016931 | 20018 | ASA TEXTILE |
| 0000016933 | 20018 | ASA TEXTILE |
| 0000016935 | 20018 | ASA TEXTILE |
| 0000017007 | 20243 | SHROFF & CO. LTD. |
| 0000017009 | 20243 | SHROFF & CO. LTD. |
| 0000017011 | 20243 | SHROFF & CO. LTD. |
| 0000017378 | 20022 | AUHC |
| 0000017379 | 20022 | AUHC |
| 0000017380 | 20022 | AUHC |
| 0000017381 | 20022 | AUHC |
| 0000017415 | 20171 | MH CONCEPTS |
| 0000017416 | 20171 | MH CONCEPTS |
| 0000017417 | 20171 | MH CONCEPTS |
| 0000017429 | 20253 | SOLSTICE INDIA |
| 0000017452 | 20243 | SHROFF & CO. LTD. |
| 0000017453 | 20243 | SHROFF & CO. LTD. |
| 0000017454 | 20243 | SHROFF & CO. LTD. |
| 0000017455 | 20243 | SHROFF & CO. LTD. |
| 0000017476 | 20017 | APPAREL UNITED |
| 0000017477 | 20017 | APPAREL UNITED |
| 0000017588 | 20018 | ASA TEXTILE |
| 0000017589 | 20018 | ASA TEXTILE |
| 0000017590 | 20018 | ASA TEXTILE |
| 0000017591 | 20018 | ASA TEXTILE |
| 0000017592 | 20018 | ASA TEXTILE |
| 0000017593 | 20018 | ASA TEXTILE |
| 0000017594 | 20018 | ASA TEXTILE |
| 0000016671 | 20022 | AUHC |
| 0000016673 | 20022 | AUHC |
| 0000016704 | 20253 | SOLSTICE INDIA |
| 0000016778 | 20017 | APPAREL UNITED |
| 0000016814 | 20171 | MH CONCEPTS |
| 0000016816 | 20171 | MH CONCEPTS |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000016926 | 20018 | ASA TEXTILE |
| 0000016928 | 20018 | ASA TEXTILE |
| 0000016930 | 20018 | ASA TEXTILE |
| 0000016932 | 20018 | ASA TEXTILE |
| 0000016934 | 20018 | ASA TEXTILE |
| 0000017006 | 20243 | SHROFF & CO. LTD. |
| 0000017008 | 20243 | SHROFF & CO. LTD. |
| 0000017010 | 20243 | SHROFF & CO. LTD. |
| 0000017648 | 20243 | SHROFF & CO. LTD. |
| 0000017649 | 20243 | SHROFF & CO. LTD. |
| 0000017650 | 20243 | SHROFF & CO. LTD. |
| 0000017701 | 20022 | AUHC |
| 0000017702 | 20022 | AUHC |
| 0000017732 | 20171 | MH CONCEPTS |
| 0000017733 | 20171 | MH CONCEPTS |
| 0000017749 | 20253 | SOLSTICE INDIA |
| 0000017817 | 20018 | ASA TEXTILE |
| 0000017818 | 20018 | ASA TEXTILE |
| 0000017819 | 20018 | ASA TEXTILE |
| 0000017820 | 20018 | ASA TEXTILE |
| 0000017821 | 20018 | ASA TEXTILE |
| 0000016590 | 20178 | MOSGEN |
| 0000016639 | 20253 | SOLSTICE INDIA |
| 0000016641 | 20253 | SOLSTICE INDIA |
| 0000016643 | 20253 | SOLSTICE INDIA |
| 0000016645 | 20253 | SOLSTICE INDIA |
| 0000016651 | 20253 | SOLSTICE INDIA |
| 0000016653 | 20253 | SOLSTICE INDIA |
| 0000016655 | 20253 | SOLSTICE INDIA |
| 0000016834 | 20243 | SHROFF & CO. LTD. |
| 0000016836 | 20243 | SHROFF & CO. LTD. |
| 0000016936 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016938 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016944 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016946 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017014 | 20384 | TAILGATE CLOTHING CO. |
| 0000017016 | 20384 | TAILGATE CLOTHING CO. |
| 0000017018 | 20384 | TAILGATE CLOTHING CO. |
| 0000017020 | 20384 | TAILGATE CLOTHING CO. |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000017022 | 20384 | TAILGATE CLOTHING CO. |
| 0000017024 | 20384 | TAILGATE CLOTHING CO. |
| 0000017026 | 20384 | TAILGATE CLOTHING CO. |
| 0000017074 | 20018 | ASA TEXTILE |
| 0000017076 | 20018 | ASA TEXTILE |
| 0000017078 | 20018 | ASA TEXTILE |
| 0000017206 | 20178 | MOSGEN |
| 0000017212 | 20384 | TAILGATE CLOTHING CO. |
| 0000017213 | 20384 | TAILGATE CLOTHING CO. |
| 0000017214 | 20384 | TAILGATE CLOTHING CO. |
| 0000017215 | 20384 | TAILGATE CLOTHING CO. |
| 0000017216 | 20384 | TAILGATE CLOTHING CO. |
| 0000017217 | 20384 | TAILGATE CLOTHING CO. |
| 0000017218 | 20384 | TAILGATE CLOTHING CO. |
| 0000017219 | 20384 | TAILGATE CLOTHING CO. |
| 0000017220 | 20384 | TAILGATE CLOTHING CO. |
| 0000017261 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017262 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017263 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017280 | 20243 | SHROFF & CO. LTD. |
| 0000017281 | 20243 | SHROFF & CO. LTD. |
| 0000017282 | 20243 | SHROFF & CO. LTD. |
| 0000017292 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017293 | 20253 | SOLSTICE INDIA |
| 0000017294 | 20253 | SOLSTICE INDIA |
| 0000017295 | 20253 | SOLSTICE INDIA |
| 0000017296 | 20253 | SOLSTICE INDIA |
| 0000017297 | 20253 | SOLSTICE INDIA |
| 0000017301 | 20253 | SOLSTICE INDIA |
| 0000017302 | 20253 | SOLSTICE INDIA |
| 0000017303 | 20253 | SOLSTICE INDIA |
| 0000017304 | 20253 | SOLSTICE INDIA |
| 0000017305 | 20253 | SOLSTICE INDIA |
| 0000017306 | 20253 | SOLSTICE INDIA |
| 0000017332 | 20018 | ASA TEXTILE |
| 0000017333 | 20018 | ASA TEXTILE |
| 0000017334 | 20018 | ASA TEXTILE |
| 0000017335 | 20018 | ASA TEXTILE |
| 0000017336 | 20018 | ASA TEXTILE |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000017337 | 20018 | ASA TEXTILE |
| 0000016589 | 20178 | MOSGEN |
| 0000016640 | 20253 | SOLSTICE INDIA |
| 0000016642 | 20253 | SOLSTICE INDIA |
| 0000016644 | 20253 | SOLSTICE INDIA |
| 0000016650 | 20253 | SOLSTICE INDIA |
| 0000016652 | 20253 | SOLSTICE INDIA |
| 0000016654 | 20253 | SOLSTICE INDIA |
| 0000016656 | 20253 | SOLSTICE INDIA |
| 0000016835 | 20243 | SHROFF & CO. LTD. |
| 0000016845 | 20243 | SHROFF & CO. LTD. |
| 0000016937 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016943 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016945 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016947 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017015 | 20384 | TAILGATE CLOTHING CO. |
| 0000017017 | 20384 | TAILGATE CLOTHING CO. |
| 0000017019 | 20384 | TAILGATE CLOTHING CO. |
| 0000017021 | 20384 | TAILGATE CLOTHING CO. |
| 0000017023 | 20384 | TAILGATE CLOTHING CO. |
| 0000017025 | 20384 | TAILGATE CLOTHING CO. |
| 0000017027 | 20384 | TAILGATE CLOTHING CO. |
| 0000017073 | 20018 | ASA TEXTILE |
| 0000017075 | 20018 | ASA TEXTILE |
| 0000017077 | 20018 | ASA TEXTILE |
| 0000017573 | 20384 | TAILGATE CLOTHING CO. |
| 0000017574 | 20384 | TAILGATE CLOTHING CO. |
| 0000017575 | 20384 | TAILGATE CLOTHING CO. |
| 0000017576 | 20384 | TAILGATE CLOTHING CO. |
| 0000017577 | 20384 | TAILGATE CLOTHING CO. |
| 0000017578 | 20384 | TAILGATE CLOTHING CO. |
| 0000017579 | 20384 | TAILGATE CLOTHING CO. |
| 0000017612 | 20178 | MOSGEN |
| 0000017706 | 20243 | SHROFF & CO. LTD. |
| 0000017711 | 20243 | SHROFF & CO. LTD. |
| 0000017756 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017759 | 20091 | FOUR HOUSE SOURCING PVT. |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000017760 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017761 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017764 | 20253 | SOLSTICE INDIA |
| 0000017765 | 20253 | SOLSTICE INDIA |
| 0000017773 | 20253 | SOLSTICE INDIA |
| 0000017774 | 20253 | SOLSTICE INDIA |
| 0000017775 | 20253 | SOLSTICE INDIA |
| 0000017776 | 20253 | SOLSTICE INDIA |
| 0000017777 | 20253 | SOLSTICE INDIA |
| 0000017780 | 20253 | SOLSTICE INDIA |
| 0000017839 | 20018 | ASA TEXTILE |
| 0000017840 | 20018 | ASA TEXTILE |
| 0000017841 | 20018 | ASA TEXTILE |
| 0000016633 | 20022 | AUHC |
| 0000016635 | 20022 | AUHC |
| 0000016695 | 20253 | SOLSTICE INDIA |
| 0000016697 | 20253 | SOLSTICE INDIA |
| 0000016724 | 20178 | MOSGEN |
| 0000016761 | 20017 | APPAREL UNITED |
| 0000016763 | 20017 | APPAREL UNITED |
| 0000016800 | 20171 | MH CONCEPTS |
| 0000016831 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016888 | 20018 | ASA TEXTILE |
| 0000016890 | 20018 | ASA TEXTILE |
| 0000016892 | 20018 | ASA TEXTILE |
| 0000016894 | 20018 | ASA TEXTILE |
| 0000016896 | 20018 | ASA TEXTILE |
| 0000016898 | 20018 | ASA TEXTILE |
| 0000016900 | 20171 | MH CONCEPTS |
| 0000016969 | 20243 | SHROFF & CO. LTD. |
| 0000016971 | 20243 | SHROFF & CO. LTD. |
| 0000016973 | 20243 | SHROFF & CO. LTD. |
| 0000016975 | 20243 | SHROFF & CO. LTD. |
| 0000016977 | 20243 | SHROFF & CO. LTD. |
| 0000016979 | 20243 | SHROFF & CO. LTD. |
| 0000016981 | 20243 | SHROFF & CO. LTD. |
| 0000017352 | 20178 | MOSGEN |
| 0000017353 | 20178 | MOSGEN |
| 0000017371 | 20022 | AUHC |
| 0000017372 | 20022 | AUHC |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000017387 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017403 | 20171 | MH CONCEPTS |
| 0000017404 | 20171 | MH CONCEPTS |
| 0000017405 | 20171 | MH CONCEPTS |
| 0000017406 | 20171 | MH CONCEPTS |
| 0000017407 | 20171 | MH CONCEPTS |
| 0000017425 | 20253 | SOLSTICE INDIA |
| 0000017438 | 20243 | SHROFF & CO. LTD. |
| 0000017439 | 20243 | SHROFF & CO. LTD. |
| 0000017440 | 20243 | SHROFF & CO. LTD. |
| 0000017441 | 20243 | SHROFF & CO. LTD. |
| 0000017442 | 20243 | SHROFF & CO. LTD. |
| 0000017443 | 20243 | SHROFF & CO. LTD. |
| 0000017444 | 20243 | SHROFF & CO. LTD. |
| 0000017445 | 20243 | SHROFF & CO. LTD. |
| 0000017446 | 20243 | SHROFF & CO. LTD. |
| 0000017447 | 20243 | SHROFF & CO. LTD. |
| 0000017467 | 20017 | APPAREL UNITED |
| 0000017468 | 20017 | APPAREL UNITED |
| 0000017492 | 20018 | ASA TEXTILE |
| 0000017558 | 20018 | ASA TEXTILE |
| 0000017558 | 20018 | ASA TEXTILE |
| 0000017560 | 20018 | ASA TEXTILE |
| 0000017561 | 20018 | ASA TEXTILE |
| 0000017562 | 20018 | ASA TEXTILE |
| 0000017563 | 20018 | ASA TEXTILE |
| 0000017564 | 20018 | ASA TEXTILE |
| 0000017565 | 20018 | ASA TEXTILE |
| 0000017566 | 20018 | ASA TEXTILE |
| 0000017567 | 20018 | ASA TEXTILE |
| 0000016632 | 20022 | AUHC |
| 0000016634 | 20022 | AUHC |
| 0000016696 | 20253 | SOLSTICE INDIA |
| 0000016723 | 20178 | MOSGEN |
| 0000016760 | 20017 | APPAREL UNITED |
| 0000016762 | 20017 | APPAREL UNITED |
| 0000016799 | 20171 | MH CONCEPTS |
| 0000016830 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000016887 | 20018 | ASA TEXTILE |
| 0000016889 | 20018 | ASA TEXTILE |
| 0000016891 | 20018 | ASA TEXTILE |

| PO# | Supplier # | Supplier |
|---|---|---|
| 0000016893 | 20018 | ASA TEXTILE |
| 0000016895 | 20018 | ASA TEXTILE |
| 0000016897 | 20018 | ASA TEXTILE |
| 0000016899 | 20171 | MH CONCEPTS |
| 0000016968 | 20243 | SHROFF & CO. LTD. |
| 0000016970 | 20243 | SHROFF & CO. LTD. |
| 0000016972 | 20243 | SHROFF & CO. LTD. |
| 0000016974 | 20243 | SHROFF & CO. LTD. |
| 0000016976 | 20243 | SHROFF & CO. LTD. |
| 0000016978 | 20243 | SHROFF & CO. LTD. |
| 0000016980 | 20243 | SHROFF & CO. LTD. |
| 0000017638 | 20243 | SHROFF & CO. LTD. |
| 0000017639 | 20243 | SHROFF & CO. LTD. |
| 0000017640 | 20243 | SHROFF & CO. LTD. |
| 0000017641 | 20243 | SHROFF & CO. LTD. |
| 0000017642 | 20243 | SHROFF & CO. LTD. |
| 0000017643 | 20243 | SHROFF & CO. LTD. |
| 0000017644 | 20243 | SHROFF & CO. LTD. |
| 0000017663 | 20178 | MOSGEN |
| 0000017671 | 20091 | FOUR HOUSE SOURCING PVT. |
| 0000017681 | 20017 | APPAREL UNITED |
| 0000017682 | 20017 | APPAREL UNITED |
| 0000017697 | 20022 | AUHC |
| 0000017698 | 20022 | AUHC |
| 0000017724 | 20171 | MH CONCEPTS |
| 0000017725 | 20171 | MH CONCEPTS |
| 0000017744 | 20253 | SOLSTICE INDIA |
| 0000017745 | 20253 | SOLSTICE INDIA |
| 0000017802 | 20018 | ASA TEXTILE |
| 0000017803 | 20018 | ASA TEXTILE |
| 0000017804 | 20018 | ASA TEXTILE |
| 0000017805 | 20018 | ASA TEXTILE |
| 0000017806 | 20018 | ASA TEXTILE |
| 0000017807 | 20018 | ASA TEXTILE |

## Charlotte Russe Purchased Fixtures

*February 4, 2016*

| | Total Quantity |
|---|---|
| | |
| **Sign Holders:** | |
| White Frame Small | **69** |
| White Frame Large | **60** |
| Reclaimed wood Small (top and bottom) | **142** |
| Reclaimed wood Large (top and bottom) | **117** |
| | |
| **Containers:** | |
| Basket (Round, Small, 8.5" dia. x 3.75"H) | **40** |
| Basket (Round, Large, 11"dia.x4.5"H) | **48** |
| Basket (Rectangular, Shallow, 9.75"Wx13"Dx4.75"H) | **30** |
| Nesting Baskets (set of 3) | **32** |
| Rice Buckets (wooden) | **58** |
| Goodie jar (Small .5 gallon) | **31** |
| Goodie Jar ( Medium, 1 gallon) | **32** |
| Goodie jar (Large, 2 gallon) | **20** |
| Shoe Riser (Baby (6"L x 5"W x 2"H) | **55** |
| Shoe Riser Kids (8"L x 6"W x 3"H) | **79** |
| Shoe Riser Kids (9"L x 7"W x 4"H), | **66** |
| | |
| **Fixtures:** | |
| Hang Bar (freestanding straight bar) | **17** |
| T Stand | **43** |
| Table top T stands | **32** |
| Jewelry Fixture (Jewelry) | **1** |
| 6' picnic table | **6** |
| Accessory Shelves | **2** |
| Baby Mannequin only | **18** |
| Cashwrap | **1** |
| Console | **1** |
| Marketing Frames | **6** |
| Nesting Tables (2 sets) | **13** |
| Platform | **2** |
| Small Round Table | **4** |

| | |
|---|---|
| Workbench kids | 8 |
| | |
| **Furniture:** | |
| Pouf, Round, Natural | 1 |
| Pouf, Round, Pink | 1 |
| Pouf, Round, | 7 |
| Pouf, Square, Natural (Natural, 18x18x13) | 2 |
| Pouf, Square, Silver (18x18x13, silver) | 4 |
| Leather Bench in bathroom | 5 |
| Circus Tables | 3 |
| Wooden round stool | 1 |
| | |
| | |
| **Visual Props:** | |
| Soda Crates (Pepsi, coke, 7up) | 91 |
| Fruit crates (bigger deeper) | 36 |
| Wooden step ladder (3 step) | 10 |
| Camera | 20 |
| Globe | 9 |
| Suitcases | 42 |
| Vintage Galvanized buckets | 25 |
| Galvanized Florist buckets (tall) | 44 |
| Wooden alphabet Block set | 6 |
| Marketing Frames: (Large White frames hanging on wall) | 40 |
| | |
| **Fixture Components:** | |
| Workbench Shelves- (grey) | 70 |
| Workbench shelf brackets | 214 |
| Workbench Hang rod bracket (2") 3- prong | 89 |
| Workbench hang rod bracket (12') | 64 |
| Workbench Hang rod (36") | 145 |
| | |
| **Feature Walls:** | |
| 4' feature wall | 5 |
| 7' feature wall | 1 |
| 9' feature wall | 4 |
| 4ft. Feature Wall Shelves | 46 |
| Feature wall shelf bracket | 390 |
| Feature Wall hang bar bracket (2") 2-prong | 308 |

45334377v.14

| | |
|---|---|
| Feature Wall Hang bar bracket (12") | **219** |
| Feature wall hang bar (47") | **78** |
| Face out bracket (short) | **56** |
| Face out bracket (long) | **511** |
| Shelf (34") | **137** |
| Hang bar (34") | **68** |
| 48" Feature Wall Shelves (4',7',9' WALLS) | **72** |
| Feature wall shelf bracket (+ baby feature) | **402** |
| Feature Wall Hang bar bracket (12") (included in baby) | **38** |
| 6' baby monkey bar | **3** |
| 7' Baby Monkey Bars | **1** |
| 7' Kids Monkey Bar | **1** |
| 8' kids monkey bars | **6** |
| Large Baby Feature Wall w/ 2 side Cabinet | **3** |
| | |
| **Mannequins:** | |
| Xsmall | **78** |
| Middle Size | **75** |
| Largest size | **34** |

**4498**

**Schedule 3.2.4**
**Assumed Contracts Requiring Consents to Assignment**

1.  Card Services Agreement (consisting of Card Services Terms & Conditions and Merchant Application) by and among Global Payments Direct, Inc., Wells Fargo Bank and Peek Aren't You Curious, Inc. dated March 17, 2015.

2.  Order Form and Software License Agreement between X.commerce, Inc. (Formerly Magento, Inc.) and Peek…Aren't You Curious as Licensee, dated April 17, 2012.

3.  Software License Agreement between Island Pacific Systems, Inc. and Peek Aren't You Curious, dated March 30, 2012, as amended.

**Schedule 9.4**
**Litigation**

1. *Bagdhassarian v. Peek Aren't You Curious*, (unfiled) threats claims against Seller for alleged violation of the Song Beverly Credit Card Act and other provisions of California law.

2. Potential claims against Seller for alleged violations of the Americans With Disabilities Act and similar state and local laws relating to the operation of Seller's Ecommerce platform.

**Schedule 9.5**
**Exceptions regarding Assumed Leases and Assumed Contracts**

None.

45334377v.14

**Schedule 9.10.1**
**Exceptions regarding Intellectual Property**

None.

45334377v.14

**Schedule 9.10.3**
**Proceedings relating to Intellectual Property**

None.

45334377v.14

**Exhibit B**

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 5596551_1

**Peek. . .Aren't You Curious, Inc.**

*Evaluation of 8 Store Sale Scenario\* v. 20 Store Closure Scenario\*\**

*\*(assumes Mar. 15, 2016 closing date for sale)*

*\*\*(assumes liquidation of remaining 8 stores starting after March 1)*

| 8 Store Sale Scenario | | 20 Store Closure Scenario |
|---|---|---|
| 1,124,741 | Beginning Cash Position (as of Feb. 5, 2016) | 1,124,741 |
| | ***February Activity*** | |
| | ***Revenues*** | |
| 512,476 | Retail Sales (8 stores TB sold) | 512,476 |
| 680,592 | Gordon Bros Liquidation Proceeds (12 stores TB closed) | 680,592 |
| 50,755 | eCommerce, less Expenses | 50,755 |
| 308,891 | Wholesale (Nordstrom) | 308,891 |
| | Other | |
| | ***Administrative Claims*** | |
| 492,190 | Headquarters/Store Staff (incl. benefits and payroll tax) | 492,190 |
| 220,305 | Rent (post-bankruptcy period) | 220,305 |
| | Post-Bankruptcy Inventory Deliveries (plus est. 503(b)(9) claims) | 850,438 |
| 20,000 | Taxes and Insurance | 20,000 |
| 78,000 | Gordon Brothers Commission and Supervision | 78,000 |
| 66,000 | Store Expenses (Utilities, Supplies, Credit Card Fees) | 66,000 |
| 65,000 | Marketing | 65,000 |
| 7,000 | Information Technology | 7,000 |
| 52,189 | Logistics/Warehouse | 52,189 |
| 15,000 | Ch.11 Professional Fees\*\*\* | 15,000 |
| 14,000 | Other | 14,000 |
| 1,647,770 | February Ending Cash (net of accrued post-BK expenses) | 797,332 |
| | ***March Activity*** | |
| | ***Revenues*** | |
| 449,216 | Retail Sales (8 stores TB sold) | - |
| - | Gordon Bros Liquidation Proceeds (add'l 8 stores TB closed) | 453,728 |
| 29,838 | eCommerce, less Expenses | |
| | Wholesale (Nordstrom) | 597,654 |
| | Other | |
| | ***Administrative Claims*** | |
| 251,291 | Headquarters/Store Staff (incl. benefits and payroll tax) | 343,500 |
| 87,600 | Rent | 142,600 |
| - | Post-Bankruptcy Inventory Deliveries (plus est. 503(b)(9) claims) | - |
| 10,000 | Taxes and Insurance | 10,000 |
| 21,000 | Store Expenses (Utilities, Supplies, Credit Card Fees) | 42,000 |
| 10,000 | Marketing | - |
| 4,000 | Information Technology | 7,000 |
| 13,047 | Logistics/Warehouse | 26,095 |
| 50,000 | Ch.11 Professional Fees\*\*\* | 75,000 |
| 7,000 | Other | 14,000 |
| 1,672,885 | March Ending Cash (net of accrued expenses) | 1,188,520 |
| | ***April Activity (through Apr. 15)*** | |
| | ***Administrative Claims*** | |
| | Headquarters/Store Staff (incl. benefits and payroll tax) | 128,500 |
| - | Rent | 32,600 |
| | Post-Bankruptcy Inventory Deliveries (plus est. 503(b)(9) claims) | |
| - | Taxes and Insurance | 2,000 |
| | Marketing | |
| - | Information Technology | 2,000 |
| - | Logistics/Warehouse | 3,000 |
| - | Ch.11 Professional Fees | |
| 1,672,885 | Ending Cash (net of accrued expenses) | 1,020,420 |
| | ***Priority Claims*** | |
| 230,000 | Employees | 230,000 |
| | Taxes | |
| 1,442,885 | Remaining Cash | 790,420 |
| | ***Unsecured Non-Priority Claims*** | |
| 2,674,051 | Lease Rejection Claims (capped) | 4,212,725 |
| | Contract Rejection Claims | unknown |
| 50,000 | Gift Card Liability | 175,000 |
| 40,000 | Attract Liability | 40,000 |
| 178,987 | Davis Polk Outstanding Legal Fees | 178,987 |
| 2,943,038 | Total Estimated Non-Priority Claims Pool | 4,606,712 |
| 49% | Est. Percentage Distribution to Unsecured Creditors | 17% |

\*\*\*Net after application of remaining retainers, subject to court appr.

Case: 16-30146    Doc# 15    Filed: 02/05/16    Entered: 02/05/16 22:27:39    Page 70 of 72

# Exhibit C

SCHNADER HARRISON SEGAL & LEWIS LLP
650 CALIFORNIA STREET, 19TH FLOOR
SAN FRANCISCO, CA 94108-2736
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 5596551_1

| Last Name | First Name | Job Title | Compensation Type | Annual Salary/Hourly Rate |
|---|---|---|---|---|
| **Headquarters:** | | | | |
| Byington | Ann | Director Of Ecommerce | Salary | 139,999.86 |
| Canales | Maria C | Chief Executive Officer | Salary | 206,000.08 |
| Canales | Marta | Special Projects | Salary | 65,000.00 |
| Klein | Jason | Chief Financial Officer | Salary | 220,000.04 |
| Valentine-Wafer | Whitney | Director Of Finance | Salary | 91,999.96 |
| Anderman | Marci | Director of Human Resources | Salary | 145,000.00 |
| Cheong | David | Director Of It | Salary | 169,999.96 |
| Ward | Tana | Creative Dir Prod Dsgn & Merch | Salary | 200,000.06 |
| Vanzanten | Kate | Director Of Store Construction | Salary | 125,000.20 |
| Wais | Christian | General Manager | Salary | 200,000.06 |